UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellant,

v.

Karen Holroyd BULT, Individually and as Executrix of the Estate of Ashley Holroyd Bult; Craig Betenson Bult; Lee E. Sitlinger; and Sitlinger, McGlincy, Steiner, Theiler Karem, Appellees.

No. 2002–CA–000482–MR.

Court of Appeals of Kentucky.

June 6, 2003.

As Modified June 27, 2003.

Discretionary Review Denied by Supreme Court Feb. 15, 2006.

Wayne J. Carroll, J. Scott Sweeney, Louisville, KY, for Appellant.

Lee E. Sitlinger, Curt L. Sitlinger, Louisville, KY, for Appellees.

Before COMBS, GUIDUGLI, and SCHRODER, Judges.

*OPINION*

COMBS, Judge.

United Services Automobile Association (USAA) appeals from a judgment of the Jefferson Circuit Court following a jury verdict in favor of Craig and Karen Bult. The Bults had filed a complaint alleging bad faith on the part of USAA in settling an insurance claim. USAA also appeals from the post-trial award of the Bults' attorney's fees. We reverse and remand.

On the evening of July 18, 1997, Ashley Bult, the fifteen-year-old daughter of the Bults, was critically injured in a single-vehicle accident. She was a passenger in an automobile owned by Hal and Cheryl Metcalfe and operated by the Metcalfes' son, Chad Metcalfe. Chad had obtained his driver's license less than three weeks before the accident. He admitted that he

was "going for a thrill" as he drove at an excessive rate of speed in an attempt to render the vehicle airborne at a railroad crossing. Chad lost control of the car, and it collided with a tree. The impact occurred at the rear passenger door where Ashley was seated. Ashley sustained grievous head injuries. She never regained consciousness and died the following day. Two other passengers in the car, Jennifer Lord and Natasha Maze, also sustained serious physical injuries as a result of the accident.

Both the Metcalfes and the Bults carried their automobile insurance coverage with USAA. The Metcalfes immediately notified USAA of the accident. On Saturday, July 19, 1997, a USAA representative contacted the parents of all of the injured passengers—including Craig Bult—to inform them of USAA's involvement. On Monday, July 21, 1997, John Moriarty, a senior claims adjuster for USAA, was assigned to handle the claims arising from the accident. He mailed forms to all those injured in the accident in order to initiate the payment of basic reparations benefits (BRB's). Cheryl Metcalfe suggested that Moriarty let some time pass before contacting the Bults again.

Moriarty waited a few days before telephoning the Bults' home on August 8, 1997. He testified that Karen Bult informed him that she and her husband did not want to discuss insurance matters at that time. At trial, Karen acknowledged receiving the call from Moriarty. However, she disagreed with Moriarty's recollection of what transpired. Karen disputed expressing any disinclination to discuss in-surance matters; rather, she testified that she told the adjuster that her husband handled such matters and that Moriarty should contact him. She also testified that she did not mention the call to her husband.

Moriarty did not hear from the Bults after his telephone call of August 8. He phoned a second time on October 9, 1997, and again spoke with Karen. He informed Karen of the $100,000 limit of liability available under the Metcalfes' policy and the availability of a seat belt death benefit of $15,000.[1] He also reminded her that she and her husband had not yet filed a claim for underinsured motorist coverage (UIM) and/or other benefits available under their own automobile policy. He requested that they send him a death certificate and a short biography of Ashley. Moriarty testified that Karen replied that she would relay the information to Craig and that they would be in touch with him. At trial, Karen recalled discussing some of these coverages with Moriarty. Once again, she testified that she referred Moriarty to her husband as she had following the previous contact. Although she did inform Craig of this call, he did not return Moriarty's call. Nor did the Bults send the requested documents.

Finally, on October 23, 1997, after having heard nothing from the Bults, Moriarty sent them a certified letter. First expressing his sympathy at Ashley's death, Moriarty informed them as follows:

> We are the insurance company for Hal G. Metcalf[e]. Mr. Metcalf[e]'s Liability Policy has a $100,000 limit as well as a

---

1. The figures of $15,000 and $25,000 are used interchangeably and contradictorily with reference to the seat belt benefit. A summary at Exhibit 20 (page 4) of the appellant's brief reveals that a check for $25,000 was issued in error when in reality the seat belt benefit was for $15,000. Moriarty had been proceeding under the mistaken belief that the Metcalfes' vehicle was equipped with air bags, which would have entitled the Bults to the $25,000 benefit. For death to a passenger wearing a seat belt where air bags were not involved, the benefit was $15,000 instead of $25,000.

Seat Belt Death Benefit of $25,000.[2] I am prepared to offer you those amounts at this time.

Since you are USAA members, I have taken the liberty of opening a claim under your Underinsured Motorist Policy.

I realize that you are dealing with a difficult loss, and I look forward to hearing from you when the time is right.

Instead of responding to this letter, the Bults conferred with two attorneys. In early November 1997, they contracted with the appellee, Lee Sitlinger, for legal representation. On December 10, 1997, nearly five months after the accident, the Bults, through their attorney, made their first demand for benefits under their own policy. They requested only the payment of no-fault payments, submitting for payment some of the medical bills incurred as a result of Ashley's hospitalization. The Bults did not mention Moriarty's offer to set up an UIM file.

In his response to Sitlinger's letter of December 10, 1997, Moriarty sent a letter on December 22, 1997, outlining his unsuccessful efforts to establish communication with the Bults. He informed Sitlinger that he would be on vacation until after the holidays and promised to resolve the Bults' claims "in an amicable fashion" upon his return to the office. In January 1998, Moriarty began paying the outstanding medical bills presented to him. On February 23, 1998, USAA sent a check for $28,306.87 to Anthem, the Bults' health insurer, to which the hospital had submitted its bills. Thereafter, between the middle of February and the first of May of 1998, USAA paid the Bults the amounts due under their policy in the order in which they were demanded by their attorney. By the first week in May, the Bults had received all of the benefits to which they were entitled under their own policy, including: $300,000 in UIM benefits, $70,000 in BRB's, and $15,000—the seat belt death benefit.

On January 8, 1998, the Bults filed a claim in the Jefferson Circuit Court against Hal, Cheryl, and Chad Metcalfe. Karen, as administratrix of Ashley's estate, sought damages for Ashley's wrongful death; both Karen and Craig sought damages for their loss of Ashley's consortium; and Holly Bult, Ashley's adult sister, sought damages for the loss of her sister's consortium. On May 12, 1998, the Bults amended their complaint to allege entitlement to $200,000 of UIM coverage provided by the Metcalfes' policy. They had by now received $300,000, the limits of UIM coverage under their own policy. In September 1998, the Bults received permission to file a second amended complaint in which they sought to hold CSX Transportation, Inc., jointly liable for Ashley's injuries. They alleged that CSX was aware of the "dangerous, hazardous and unsafe condition" of the railroad crossing where the accident occurred.

The trial was scheduled to commence in April, 1999. Prior to trial, the court dismissed Holly Bult's claim for loss of her sister's consortium. Citing *Pridham v. State Farm Mutual Insurance Co.*, Ky. App., 903 S.W.2d 909 (1995) (review denied), the trial court granted USAA's motion for summary judgment on the first amended complaint, finding no liability on the part of USAA to the Bults for $200,000 of UIM coverage provided by the Metcalfes' policy.[3] Finally, it granted CSX's

---

2. Refer again to footnote one.

3. The rule of *Pridham* dictates that where a passenger in a one-car accident has recovered policy liability limits, no UIM will be available.

motion for summary judgment on the issue of its liability.[4]

The only claims remaining to be resolved were the Bults' negligence claims against the Metcalfes. These items were settled on the morning of trial as follows: the Metcalfes agreed to pay the Bults $25,000 immediately and to give the Bults a note for an additional $25,000 to be paid within six months and to be secured by a lien on the Metcalfes' home[5]; the Metcalfes agreed (as previously offered by USAA on October 23, 1997) to pay the Bults $100,000, the maximum amount of liability coverage in the Metcalfes' USAA policy; the Metcalfes agreed to assign to the Bults any bad faith claim they may have against USAA; and the Bults agreed to release the Metcalfes from any further action or claims. Although the parties agreed that the Metcalfes would be entirely released by the payment of $150,000 (later reduced to $135,000), they agreed that a bench trial would be conducted to determine the actual amount of damages suffered by the Bults. Even though all of the defendants either had been dismissed from the lawsuit or had been released by settlement, the trial court agreed to permit the Bults to have a trial in order to ascertain the damages to which they might have been entitled had they not settled.

On June 10, 1999, the court entered a judgment in which it determined that the Bults had sustained damages in the amount of $2,313,071.20.[6] The Bults then filed a third amended complaint, claiming that USAA had acted in bad faith in its handling of the Metcalfes' defense and in its handling of the first-party benefits owed under the Bults' insurance policy.

The bad faith claims were tried before a jury in October 2001. The Bults asked the jury to award them $1.8 million—the difference between the trial court's determination of damages and the amount that they actually recovered from USAA. They sought a similar amount for their humiliation and embarrassment. Asking that the jury be "generous" in setting damages on their first-party claim of bad faith, the Bults urged the jury to send the insurance company a message by assessing hefty punitive damages.

The jury found in favor of USAA on the assigned claim and found that the Bults would not have settled their claim against the Metcalfes for the policy limits—regardless of the manner in which USAA handled the claim. Nonetheless, the jury found that USAA acted in bad faith in its handling of some of the benefits to which the Bults were entitled under their own policy. Accordingly, it awarded the Bults $100,000 in compensatory damages and $1,000,000 in punitive damages. A judgment of $1,100,000 was entered on October 26, 2001. On February 26, 2002, the trial court denied USAA's motion for a judgment notwithstanding the verdict (jnov) or for a new trial. It also awarded the Bults an additional judgment against USAA in

---

**4.** The Bults appealed the summary judgment in favor of the railroad. On November 3, 2000, this Court reversed the judgment, holding that the testimony of the Bults' expert, if believed, could support an apportionment of the fault for the fatal accident against CSX. On June 21, 2001, the Bults settled their claim against CSX for $200,000.

**5.** After obtaining a financial statement from the Metcalfes, the Bults agreed to reduce the Metcalfes' personal contribution to a one-time payment of $35,000.

**6.** This amount included the following elements of damage: $7,757.54 for funeral and burial expenses; $31,268.66 in medical expenses; $100,000 for Ashley's mental and physical pain and suffering; $2,049,255 for Ashley's loss of power to labor and earn money; $100,000 for the Bults' loss of consortium; and $25,000 in punitive damages.

the amount of $366,667 for their attorney's fees. This appeal followed.

USAA argues that the trial court erred in failing to grant its motion for a directed verdict or for a judgment notwithstanding the verdict (jnov) based on an absence of sufficient evidence to support a claim for bad faith. USAA contends that the Bults failed to meet their burden of presenting evidence of the type of gross misconduct necessary to establish a claim for bad faith in the context of the handling of insurance claims. We are compelled to agree with USAA.

Actions for bad faith insurance claims settlements in Kentucky may arise either under common law or by way of the Unfair Claims Settlement Practices Act, KRS[7] 304.12–230. The definitive case on the subject is *Wittmer v. Jones,* Ky., 864 S.W.2d 885 (1993). *Wittmer* holds that in order to prevail on a bad faith claim, the insured must prove the following elements:

(1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Id.* at 890. Holding that "there is no such thing as a 'technical violation' of the UCS-PA," *Wittmer* defines and prescribes the nature of evidence that must exist in order for the matter to be properly submissible to a jury:

Before the cause of action [for bad faith] exists in the first place, there must be evidence sufficient to warrant punitive damages:

"The essence of the question as to whether the dispute is merely contractual or whether there are tortious elements justifying an award of punitive damages depends first on whether there is proof of bad faith and next whether the proof is sufficient for the jury to conclude that there was 'conduct that is *outrageous,* because of the *defendant's evil motive* or his *reckless indifference* to the rights of others.' " [Citations omitted.] (Emphasis added.)

This means there must be sufficient evidence of *intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury.* (Emphasis added.)

*Id.* See also, *Guaranty National Insurance Company v. George,* Ky., 953 S.W.2d 946 (1997), and *Motorists Mutual Insurance Co. v. Glass,* Ky., 996 S.W.2d 437 (1997, modified 1999).

The evidentiary threshold is high indeed. Evidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights. Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury. Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.

A review of the evidence presented by the Bults reveals a complete absence of the type of conduct required to meet this standard. The Bults had carried both

7. Kentucky Revised Statutes.

homeowners and automobile insurance coverage with USAA for many years prior to the accident. As late as the trial on their claims of bad faith, they continued to insure their home with USAA. Although the Bults made several claims under their automobile insurance policy over the years, they testified they were unaware that they were entitled to any sums under their own policy to compensate them for their daughter's injuries since the accident did not involve their vehicle. Because they were unable to pay the medical and funeral expenses that they had incurred, they testified that were humiliated by the receipt of dunning notices from the providers of those services.

The Bults denied ever receiving the forms mailed by Moriarty immediately after the accident to commence the payment of BRB's. However, they acknowledged receiving Moriarty's phone calls and his letter of October 23, 1997, tendering an offer to give them the Metcalfes' policy limits and offering to open a claim under their own policy for UIM benefits. They testified that they did not respond to the letter because friends had encouraged them to retain legal counsel.

Four expert witnesses testified for the Bults: John W. Partlow, an insurance litigation consultant; Michael McDonald, a former judge of the Jefferson Circuit Court and of the Kentucky Court of Appeals, who had worked as an insurance claims adjuster in the 1960's; Martin Huelsmann, a law school professor; and Larry Franklin, a practicing attorney. In support of their opinions, the experts alluded to one or more of the following facts which they believed to be elements of bad faith on the part of USAA: the insurer's failure to employ separate claims adjusters for each of its two insureds; Moriarty's initial setting of the reserve for the company's liability for Ashley's death at $75,000;

USAA's failure to inform the Bults of all the benefits to which they were entitled under their own policy immediately following the accident; USAA's failure to offer the $100,000 liability coverage before October 23, 1997; Moriarty's failure to follow by letter his phone calls of August and October 1997; USAA's failure to send a personal representative to the Bults' home to establish a line of communication; USAA's failure to supervise Moriarty more carefully; the failure of USAA to maintain a sufficient staff to handle complex claims more promptly; and USAA's failure to pay the first-party benefits in a more timely manner.

The Bults contend that this lengthy recital of alleged omissions is not merely indicative of bad faith but that it also constitutes compelling evidence of the insurer's misconduct. We disagree.

■ It would most assuredly have been the better practice for USAA to employ two separate adjusters to avoid even the appearance of a conflict of interest. However, the Bults point to no statutory or common law duty requiring an insurer to assign two separate claims adjusters under the circumstances presented in this case. Moreover, it is undisputed that neither the Bults nor their attorney requested that a separate adjuster be assigned to handle their claims. There is no evidence to indicate that a separate adjuster to handle the Bults' first-party claims would have been more successful than Moriarty in establishing communication with the Bults. The Bults admitted that their refusal to respond to Moriarty's calls and letters had no relation to the fact that he was handling the claims of others involved in the accident.

Representatives of USAA testified that it was the company's normal practice to assign separate adjusters in cases involving a collision among multiple vehicles for

which it provides insurance. However, it deviated from that policy and allowed Moriarty to handle all the claims in this matter because there was only one car involved (eliminating any dispute as to which driver was at fault) and because there was no question that the damages would exceed the available limits of coverage under both policies. Thus, USAA contends that its decision not to assign a separate adjuster did not create a conflict of interest in handling the claims—nor did it cause any prejudice to the Bults.

The Bults' experts testified that the use of one adjuster created the *potential* for the improper handling of claims because it might enable the adjuster to leverage the coverages owed under one of the policies against the other. However, the existence of a mere potential for conflict does not suffice to meet the burden of proof imposed upon the Bults. It was incumbent upon them to prove that USAA did in fact act improperly in handling their claims. The potential for mischief must be shown to have ripened into the reality of tortious conduct:

> We recognized in *Wittmer, supra,* that to find bad faith there is a threshold, and the evidence must be sufficient to establish that a tort has occurred.

*Guaranty National Insurance Company v. George, supra,* at 949.

The Bults did not allege nor did they present evidence that Moriarty (or any other representative of USAA) offered them any amount less than the total benefits provided for in their own policy as well as the liability limits of the Metcalfes' policy. Thus, there was no evidence of the type of leveraging suggested by the conjecture of the Bults' expert witnesses. While assigning two adjusters might have hastened or expedited the process of handling the many claims that arose from the accident, the use of only one did not give rise to any reasonable inference that USAA was motivated by evil design or reckless disregard for the rights of the Bults.

■ Next, the Bults' experts found evidence of bad faith from the amount of reserve set by Moriarty. While he originally set a reserve under the Metcalfes' liability policy at $75,000, within a matter of days Moriarity's supervisor increased the reserve to the full limits of liability of $100,000. Nevertheless, Judge McDonald testified that:

> [w]hether [Moriarty] was low balling it or not, there's an inference that he was gonna try to low ball it and get the thing settled for $75,000.00.

In a similar vein, attorney Franklin told the jury that by setting the reserve at $75,000, USAA had created the potential of cheating the Bults out of their $300,000 of UIM coverage:

> Well, I'm a former military person as you've heard and I'm with USAA, too, and I was—I was outraged to see this kind of conduct by USAA. It's not what I want to see from people that are supposed to represent us because [setting the reserve] is the first sign of bad faith. If you got a $100,000.00 coverage and you know the liability's absolute and they had this boy's statement where he said it was just me, I was driving, nobody did anything else, and he said, Ashley's got her seat belt on and then she dies and know all of that, that all they got is $100,000.00, why would you set the reserve for $75,000?
>
> ... And the treacherous part to me is if the family—the Bults were then told well we have $75,000 for you, if they would've accepted that, it would've totally knocked out their $300,000 underinsured motorist they had in their own policy.

Now, the problem with all this is as lay people we don't usually know all the intricacies of policies. You ever read one, it'll put you to sleep, boring as can be, but they had rights and USAA had both families insured. These are families that lived together in the same neighborhood, these are families that prayed together for their children's sake at the hospital. These are families that didn't need to be pitted against each other. They just needed for the company that they both paid their hard earned money to, to do the right thing for them, and by setting that limit at $75,000.00, had they taken it, then the underinsured motorists couldn't come into play because under the law they wouldn't have exhausted all the insurance that was available on the car that she was in.[8]

Judge McDonald further outlined that the purpose for setting a reserve is to satisfy state regulatory statutes and to guarantee that the insurer will have the ability to pay a claim once its liability has finally been established—either by settlement or judgment. It is certainly possible that the amount of reserve set by an adjuster could be indicative of bad faith if the insurer has denied a claim or has attempted to "low-ball" a claim. It is undoubtedly a red flag. However, we believe that the reserve set in this case did not constitute bad faith on the part of USAA for two reasons: (1) the reserve was very quickly increased by the company after further investigation; and (2) there was never an actual attempt to negotiate or to settle the claim for $75,000. The pitfalls described

in Franklin's testimony never materialized in the actual course of conduct by USAA in processing the claim.

■ The remaining issues about which the Bults' experts testified involved: Moriarty's failure to follow up his telephone conversations with letters; his failure to meet with the Bults in person; and his failure to contact them earlier than August 8, 1997. While this evidence would at the most perhaps indicate neglect on Moriarty's part, it falls far short of reckless disregard of the Bults' rights or of a malevolent plot to deprive them of the benefits provided by their automobile insurance policy. In making the following observation about the case to the attorneys outside the presence of the jury, the trial judge accurately reflected upon the insubstantial nature of these complaints:

I know everybody would agree, it's just—it's just a shame that we're even here. I—I mean, if just a few little things would've been done differently, we wouldn't be here, and—and I think—USAA can make a very good argument to the jury. The few little things that could—would've been done differently to have kept us [away from] here would've been Mr. Bult picking up the phone and calling and—and vice versa.

As we have already observed, the evidence reveals that the Bults received *all the benefits* to which they were entitled under their automobile insurance policy by various payments made between January and May of 1998. While Moriarty was slow, he nonetheless secured payment of

8. This is a small portion of the statements made by attorney Franklin in his capacity as a witness while *standing* in front of the jury. USAA objected to the trial court's allowing the witness to make a closing-type argument to the jury as well as to his misstatements about the law concerning underinsured motorist coverage. Because of our ruling that

the evidence was *insufficient* to be submitted to the jury in the first instance, it is not necessary for us to address USAA's argument that it is entitled to a new trial based on the prejudice created by Franklin's alleged misstatement of the law or as to conduct more befitting counsel than a witness.

the various coverages in the order in which they were demanded by the Bults. USAA did not deny a single claim; nor did it deny the limits of coverage in the Bults' policy. In essence, the Bults' claim of bad faith narrows down to a delay in their receipt of those payments.

USAA correctly relies on *Motorists Mutual Insurance Co. v. Glass, supra,* 996 S.W.2d at 452, which holds that:

> *mere delay in payment does not amount to outrageous conduct* absent some affirmative act of harassment or deception. In other words, there must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage. (Emphasis added.)

Clearly there was some delay [9] in making the payments after demand was made. USAA offered explanations for the delays as follows: the number of claims that Moriarty had to process; the confusion created by the health insurance carrier; the necessity of obtaining a legal opinion on the issue of what is contemplated by "survivor's economic loss"; and with respect to the UIM claim, the multiple tiers of company officials that Moriarty had to consult in order to obtain authority to issue the $300,000 draft. Our search of the record reveals no evidence from which the jury could reasonably infer that the delay that the Bults encountered was designed to either "extort a more favorable settlement" from them or to conceal the amount of their coverage. On the contrary, a fair measure of the delay is attributable to

their own conduct. The Bults did not dispute that they made no effort to submit the documentation that Moriarty requested or to contact anyone at USAA.

In summary, viewing the record in the light most favorable to the Bults and drawing all inferences in their favor, we conclude that there was insufficient evidence of bad faith to permit the jury to consider the issue. Accordingly, the judgment of the Jefferson Circuit Court is reversed, and this matter is remanded with directions that the complaint against USAA be dismissed.

ALL CONCUR.

---

9. The Bults could have invoked the provisions of KRS 304.12–235, which would have provided 12% interest on the value of the final settlement as well as reimbursement for a reasonable attorney's fee for failure to pay a claim to an insured within thirty days of no-

tice and proof of claim. The Bults instead elected to pursue a claim pursuant to KRS 304.12–230, the Unfair Claims Settlement Practices Act, involving the much higher burden of proof that we have analyzed at some length.