ALICE M. BATCHELDER, Chief Judge,
dissenting.
I respectfully, though strongly, dissent from the majority’s decision to reverse the district court’s summary judgment order because there is simply no evidence in the record establishing that State Farm acted in bad faith. The majority completely misapplies the Kentucky Supreme Court’s requirement that “[b]efore [a] cause of action [under the U.C.S.P.A.] exists in the first place, there must be evidence sufficient to warrant punitive damages,” which requires proof that is “sufficient for the jury to conclude that there was conduct that is outrageous[] because of the defendant’s evil motive or his reckless indifference to the rights of others.” Wittmer v. Jones, 864 S.W.2d 885, 890 (Ky.1993) (internal citation and quotation marks omitted). Phelps has failed to make this threshold showing. On summary judgment, Phelps must “do more than simply show that there is some metaphysical doubt as to the material facts” — she must present specific *708 facts establishing bad faith. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). She has wholly failed to do so. The majority infers bad faith from four of State Farm’s actions, but even when those actions are viewed in the light most favorable to Phelps, they are insufficient to establish bad faith of an outrageous nature.
First, the $25,000 settlement offer is insufficient to establish bad faith because it adequately accounted for Phelps’s claimed loss. Phelps gave State Farm documentation indicating that her actual damages were $22,620.22, and, as the majority recognizes, Phelps did not provide any documentation of her pain and suffering or future wage loss. Nevertheless, the majority faults State Farm for failing to include in its offer “an approximate amount for these damages based on a likely jury verdict.” This conclusion completely overlooks State Farm’s evaluation range, from which State Farm derived the $25,000 offer. In this evaluation, State Farm explicitly accounts for pain and suffering. Moreover, even though Kentucky does not require an insurance settlement offer to include a jury verdict estimate, the record shows that in creating its evaluation range for her claim, State Farm did account for how a jury would consider Phelps’s medical evidence.
Considering these facts in the light most favorable to Phelps does not establish that State Farm’s initial offer was in bad faith. Though the offer was at the low end of the evaluation range, it covered the cost of Phelps’s past medical bills and lost wages, which was the only documented loss that State Farm had at the time it made the offer, “[doming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case.” Farmland Mut. Ins. Co. v. Johnson, 36 S.W.3d 368, 376 (Ky.2000) (internal quotation marks and citation omitted). But the evidence that State Farm had at the time of the offer, viewed in the light most favorable to Phelps, does not indicate the outrageous conduct or reckless disregard for her rights that is necessary for a bad faith claim under the U.C.S.P.A. The offer included the only documented damages that State Farm was aware of, and Phelps has not presented specific facts from either her medical documents or her experts showing that State Farm deliberately neglected to include additional damages in the offer.
Second, the delays along the way of the settlement process are likewise not indicative of bad faith. The majority exaggerates the importance of the various delays during Phelps’s settlement by grouping them together as one “nearly three-year long delay,” when the majority’s main concern rests on only one particular instance of delay — the delay between February 11, 2004, and September 23, 2004. Even considering the entire three-year settlement process as a delay is insufficient to establish bad faith absent evidence of evil motive or reckless indifference to Phelps’s rights. See United Servs. Auto. Ass’n v. Butt, 183 S.W.3d 181, 186 (Ky.Ct.App. 2003) (“Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith.”). Though the majority cites two non-binding cases to support its conclusion that the overall time to settle was too long, those cases involve delays that are accompanied with evidence of improper motive or reckless indifference. See Med. Protective Co. v. Wiles, No. 2010-CA-000262, 2011 WL 2420011, at *8-9 (Ky.Ct.App. Oct. 21, 2011) (finding evidence of “questionable motive” and stating that “it must be kept in mind that mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception.... In other words, *709 there must be proof or evidence supporting a reasonable inference that the purpose of delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage” (internal citation omitted)); King v. Liberty Mut. Ins. Co., 54 Fed.Appx. 838, 837-38 (6th Cir.2003) (finding evidence of reckless disregard for the claimant’s rights where the insurer refused to acknowledge a prior settlement agreement that the insurer had in its own files and failed to search those files for 18 months, and where there were disputed facts regarding an employee’s knowledge of the prior settlement).
After faulting the three-year settlement process, the majority discusses its main concern — the February to September 2004 delay, during which time State Farm was gathering information regarding Phelps’s prior spine injuries. The majority concludes that this delay was in reckless disregard of Phelps’s rights because information regarding Phelps’s prior medical history was not necessary to evaluate her claim. This conclusion, however, is incorrect because, at the very least, the information about her 1999 injury was relevant to State Farm’s evaluation of the cause and extent of her 2003 injury because both injuries were to the same spinal region. The majority ignores this logical connection in favor of its conclusion that State Farm could have evaluated Phelps’s claim without the 1999 records. Although State Farm could have chosen to evaluate the claim without the records, it does not necessarily follow that its decision to require the records was in bad faith. Rather, the 1999 records’ relevance to the spinal region that was at issue in 2003 gave State Farm a reasonable basis in fact to request the records, and the mere delay in obtaining them does not alone indicate bad faith. See United Servs. Auto. Ass’n, 183 S.W.3d at 186 (“Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury.... Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.”).
The majority infers that State Farm is disingenuous when it says that the delay was necessary to gather information regarding the 1999 injury because State Farm had access to a database that would have “uncovered the existence of Phelps’s 1999 injury well before” receiving her medical records. However, State Farm already knew about the existence of Phelps’s prior spinal injury prior to receiving the medical records — that was why State Farm requested the records. To the extent the majority implies that the database would have given State Farm earlier information that would have been identical to the information it eventually learned from the medical records, that argument does not comport with the evidence in the record. Phelps’s expert, Gary Fye, stated that State Farm has access to an external reporting service that would automatically inform State Farm whether Phelps had any prior injuries or claims; however, Fye stated that this service would not necessarily disclose information regarding the medical providers for those prior claims. Nor is there any information in the record that this service would disclose any of the details of the prior injury or claim that the medical records would have disclosed. Essentially, the index would have informed State Farm that there was a prior injury, and it may have given State Farm the names of the medical providers for that injury, but there is no indication that it would have given the details of the injury, as the majority suggests. Even viewed in the light most favorable to Phelps, this evidence does not indicate that the delay in obtaining her prior medical records consti *710 tutes the bad faith that she is required to show to establish her U.C.S.P.A. claim.
Third, the majority’s conclusion that State Farm’s failure to disclose its policy limit constitutes bad faith lacks any basis in law or logic. Viewing the evidence in Phelps’s favor, and presuming for this purpose that Phelps’s counsel, Carroll, had requested information regarding the policy limit, State Farm did not act in bad faith when it did not disclose it. Kentucky law does not require insurers to disclose their policy limits during settlement negotiations, and neither Phelps nor the majority have cited a Kentucky case that has indicated that failing to disclose a policy limit constitutes bad faith under the U.C.S.P.A. More importantly, Phelps has not presented any evidence to show that this failure to disclose the policy limit stemmed from State Farm’s evil motive or reckless indifference to her rights. See Wittmer, 864 S.W.2d at 890. Without such evidence, the failure to disclose the policy limit cannot support an inference of bad faith under the U.C.S.P.A.
Moreover, the record shows that State Farm offered to pay its policy limit as soon as it knew that a reasonable evaluation of the claim was in excess of the limit — -a practice that the majority concludes is proper. On March 23, 2006, State Farm indicated on its activity log that its counsel believed Phelps “may be a limits case.” On April 11, 2006, State Farm agent Jones received authority to increase the settlement offer to the $50,000 limit. Jones offered Carroll $40,000, which he refused and then demanded $50,000. State Farm responded by offering the policy limit, and on April 13, 2006, Carroll accepted on Phelps’s behalf. Even viewing these facts in Phelps’s favor, State Farm’s failure to disclose the policy limits until its conclusion that she was a “limits case” does not establish bad faith. Instead, it is more indicative of State Farm’s effort to engage in normal settlement negotiation strategy, typical in civil litigation.
Finally, the majority takes issue with some of State Farm’s claims-handling practices but again fails to address how these practices exhibit the type of bad faith stemming from an evil motive or reckless indifference that Phelps needs to present. There is simply no evidence in the record, including Phelps’s experts’ depositions, that any of State Farm’s actions rose to the level of bad faith that is required under the U.C.S.P.A. Phelps’s experts do nothing more than make concluso-ry statements that State Farm acted with improper motives, and they do not present any evidence to support those conclusions other than their own inferences. “Although juries are generally free to believe expert witnesses, a plaintiff cannot survive summary judgment with an expert’s bare opinion on the ultimate issue.” Hirsch v. CSX Transp., Inc., 656 F.3d 359, 363 (6th Cir.2011) (internal citations omitted). Their reports and depositions discuss the training and resources available to State Farm agents, but that evidence does not establish evil motive or reckless indifference to claimants’ rights, even when viewed in the light most favorable to Phelps.
By failing to apply Kentucky’s law requiring that a bad faith claim must be supported by actual evidence of bad faith, the majority has opened the door to cries of “bad faith” each time a discontented claimant encounters delays and challenges prior to settlement. Therefore, I must respectfully dissent.