**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1063n.06

**No. 11-5965**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Oct 09, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NATIONAL SURETY CORPORATION, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF KENTUCKY |
| HARTFORD CASUALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: SILER and COOK, Circuit Judges; STEEH, District Judge.[*]

COOK, Circuit Judge. Plaintiff-Appellant National Surety Corporation appeals from the district court's grant of summary judgment to Defendant-Appellee Hartford Casualty Insurance Company. Hartford insured Sufix, Inc. as its primary liability carrier with $1 million of coverage. National provided Sufix with $10 million of excess liability coverage. In an equitable subrogation action between Hartford (as primary carrier) and National (the excess carrier) concerning National's payment of a $4.78 million excess judgment against Sufix, National sought reimbursement from Hartford, claiming that Hartford breached its primary insurer's duty to avoid excessive judgments

---

[*]The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

against an insured.  This court's earlier decision, in *National Surety Corp. v. Hartford Casualty Insurance Co.* (*National I*), 493 F.3d 752 (6th Cir. 2007), circumscribed the nature of National's subrogation rights; we held that National could press the bad faith claims Sufix could bring against Hartford.  In the remanded subrogation action, cross-motions for summary judgment resulted in the district court's finding that Hartford's conduct fell short of bad faith under Kentucky law.  National now seeks reversal and remand for entry of summary judgment in its favor.

I.

*A.  Facts*

The parties agree on the relevant facts.  In 1998, Tommy Cook operated a weed trimmer fitted with a Sufix-made trimmer head.  During routine operation, the head allegedly shattered and severely lacerated Cook's leg.  Cook filed suit against Sufix in 1999, and Hartford hired an attorney to defend Sufix. During settlement negotiations, Cook offered to settle his claim for $1 million—the amount of Hartford's policy limit.  Hartford refused, and Cook's case proceeded to trial.

After pretrial negotiation and mediation with Cook failed less than a month before trial, Hartford sent an "excess letter" to Sufix, notifying it that a judgment at trial may exceed Hartford's primary policy coverage limits.  Sufix's excess liability policy with National included a provision requiring Sufix to alert National when claims or suits are filed, or when it learned of any occurrence that could precipitate a claim.  Despite its knowledge of Cook's pending suit, Sufix failed to notify

National; National instead learned of Cook's claim (through a third party) just weeks before the May 2002 trial date.

The jury returned a verdict against Sufix for $5,783,816.09, comprised of $43,988.81 for past medical expenses, $250,000 for future medical expenses, $463,742 for past and future lost earnings, $2,051,000 for pain and suffering, and $2,975,084.28 in punitive damages. Hartford paid its policy limit—$1 million—and National satisfied the remaining $4.78 million, apparently without raising any defenses it might have against Sufix under the notice provision of the excess policy. Following an unsuccessful appeal of the punitive damages award in Kentucky state court, National (an Illinois corporation) sued Hartford (a Delaware corporation) in the Western District of Kentucky.

*B. Procedural History*

Focusing primarily on Hartford's lax attention to the risks Cook's claim presented, National argued that Hartford acted in bad faith toward Sufix by exposing "Sufix to an unreasonable risk of an excess verdict." In support, National cited evidence that Hartford (1) failed to consider information in its own files, (2) failed to conduct a diligent investigation into Cook's claim, (3) failed to properly respond to Cook's $1 million demand during settlement negotiations, (4) failed to timely notify Sufix that a verdict may exceed Sufix's primary policy limits, (5) relied too heavily on defense counsel, (6) failed to account for the possibility of a punitive damage award, and (7) made only "lowball" offers during settlement talks with Cook.

No. 11-5965
*Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*

The district court granted summary judgment to Hartford. It framed National's arguments as two claims: (1) that Hartford should be liable for the full amount of the judgment due to its tardy notification of National to the exposure it faced; and (2) that Hartford's claim-handling deficiencies amounted to bad faith conduct toward Sufix, triggering National's exposure.

The tardy-notification argument received short shrift from the district court; it equated it with National's "failure to investigate" claim eschewed by this court in the first appeal. The district court, however, mischaracterized National's notification argument because it overlooked National's claim that Hartford notified Sufix of the possibility of an excess verdict too late, and therefore limited Sufix's defense options. (R. 57-1, Pl.'s Mem. Supp. Mot. Summ. J. at 32.) Yet, National also pressed the point that Hartford's late notification to Sufix limited National's defense options. (R. 59, Pl.'s Resp. to Def.'s Mot. Summ. J. at 6.) The district court bypassed analyzing National's first argument and held that Hartford had no duty to notify National of the possibility of the excess verdict. Because it left the first argument unresolved, we address it in this appeal.

After considering National's remaining arguments, the district court denied National's bad faith claim. Despite "National spend[ing] a great deal of time in its briefs pointing out what it perceives as deficiencies in Hartford's handling of the Cook matter," the district court found that National failed to "present any evidence that Hartford . . . engaged in a 'conscious doing of wrong.'" Citing Kentucky's high standard for bad faith, which requires the plaintiff to prove an insurer acted with conscious wrongdoing or reckless disregard for the insured's rights, the district court held that

"[a]lthough National cites many aspects of the Cook case it wished Hartford had handled differently . . . it has not shown that Hartford acted in bad faith," because "the evidence National cites is, at best, evidence of 'mere negligence . . . . [i]nadvertance, sloppiness, or tardiness.'" (R. 62, Mem. Op. at 6 (quoting *United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003)).) National timely appeals.

## II.

National's appeal maintains that Hartford's claim-handling did indeed satisfy Kentucky 's bad faith standard. Specifically, National contends that Hartford's actions, viewed cumulatively, establish National's bad faith claim and entitles it to a reversal of the district court's grant of summary judgment to Hartford. We review the district court's grant of summary judgment de novo. *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006).

### A. Kentucky law's bad faith standard

Kentucky law imposes a three-part test for bad faith claims:

> (1) [T]he insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). "[I]n order to survive a motion for summary judgment, a plaintiff in a bad faith action must come forward with evidence, sufficient to defeat a

directed verdict at trial, which reveals some act of conscious wrongdoing or recklessness on the part of the insurer." *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 434 (W.D. Ky. 1991). Kentucky's standard is high. Plaintiffs alleging bad faith must "prove . . . conduct . . . of such an arbitrary and reprehensible nature as to constitute bad faith." *Winburn v. Liberty Mut. Ins. Co.*, 8 F. Supp.2d 644, 647 (E.D. Ky. 1998) (quoting *Matt*, 798 F.Supp. at 433). Bad faith "is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose of some moral obliquity. It implies conscious doing of wrong. . . . It partakes of the nature of fraud." *Matt*, 798 F. Supp. at 433.

The Kentucky Court of Appeals reaffirmed the high evidentiary threshold in bad faith actions against insurers in *United Servs. Automobile Ass'n v. Bult*, 183 S.W.3d 181 (Ky. Ct. App. 2003). *Bult* identified *Wittmer* as the definitive case governing bad faith actions, *id.* at 186, and noted that for a bad faith claim to proceed to a jury, evidence sufficient to support an award of punitive damages against the insurer must exist. *Id.* The "[e]vidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights." *Id.* Unless a plaintiff demonstrates this two-part standard, the claim fails. "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury." *Id.* Insurer errors fail to meet this exacting standard. "Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of *malice* or *flagrant malfeasance* must be shown." *Id.* (emphasis added). In *Bult*, the court concluded that despite the insurer's failure to follow a "better" claims handling process, the insurer's actions

did not "give rise to any reasonable inference that [the insurer] was motivated by evil design or reckless disregard for the rights of [the insureds]." *Id.* at 187–88.

*B. Hartford's conduct falls short of Kentucky's bad faith standard*

National must show that Hartford "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer*, 864 S.W.2d at 890. As the district court ably noted, "the evidence National cites is, at best, evidence of 'mere negligence . . . . [i]nadvertance, sloppiness, or tardiness.'" We agree.

National's briefing skews Kentucky's bad faith standard and erroneously relies on gross negligence to prove its bad faith claim. While National correctly points out that a bad faith claim requires evidence sufficient to justify punitive damages, it errs by simply equating acts of gross negligence with those motivated by conscious wrongdoing or reckless disregard toward Sufix. Our inquiry is to determine whether Hartford's actions constitute "outrageous conduct . . . driven by evil motives or an indifference to [the] insureds' rights." *Bult*, 183 S.W.3d at 186.

First, National claimed that "Hartford had information in its file that Sufix faced $1.6 million in exposure, but it responded to the demand with a lowball offer of $75,000." In response to Cook's attorney's demand of $1 million (Sufix's policy limit), Hartford began negotiations with a low offer. National points to no evidence that Hartford "lowballed" Cook because of evil motives or an indifference to Sufix. In hindsight, settling Cook's case for less than 20% of the final judgment

appears wise. But National fails to provide evidence that an "evil design" or an indifference to Sufix's rights motivated Hartford's failure to settle for Sufix's policy limits during initial settlement negotiations.

Second, National alleges that Hartford failed to timely notify Sufix of the potential of an excess verdict. Again, National provides no evidence that "evil motives" or "indifference" to Sufix's rights caused Hartford's delay in notifying Sufix. After negotiations with Cook's counsel broke down, Hartford notified Sufix of the possibility of an excess verdict. In light of the actions Hartford took on Sufix's behalf, National cannot show that Hartford acted with conscious wrongdoing or reckless indifference by notifying Sufix of the potential for an excess verdict after pretrial negotiations ended. Furthermore, Sufix—not Hartford—had a contractual duty to notify National of the excess verdict's possibility.

National's next two allegations fault Hartford's claim-handling process but provide no evidence that "evil motives or . . . an indifference to [Sufix's] rights" drove Hartford's conduct. *Bult*, 183 S.W.3d at 186. National claims that Hartford knew of an excess carrier's existence, yet failed to use this information to benefit Sufix. National also targets as "grossly negligent" National's alleged failure to conduct an independent investigation and evaluate punitive damages. Each argument suggests that Hartford *should* have handled Sufix's claim differently but not that Hartford acted with a consciousness of wrongdoing or reckless disregard toward Sufix.

National's final argument, that public policy requires Hartford be held liable for failing to effect a prompt, fair, and equitable settlement of Sufix's claim, also lacks the requisite bad faith attributes. Absent evidence that Hartford acted maliciously or with reckless indifference toward Sufix, we have no grounds to disagree with the district court's opinion.

III.

We AFFIRM the judgment of the district court.