William COX; Sheila Cox,
Plaintiffs–Appellants,

v.

EMPIRE FIRE & MARINE INSUR-
ANCE CO., Defendant–Appellee.

No. 15–5571.

United States Court of Appeals,
Sixth Circuit.

Feb. 1, 2016.

BEFORE: COLE, Chief Judge;
SUHRHEINRICH and ROGERS, Circuit
Judges.

ROGERS, Circuit Judge.

In April 2008, a fire destroyed the unoc-
cupied and unfurnished home of William
and Sheila Cox. Three months later, the
insurer, Empire Fire & Marine Insurance
Company (Empire), paid $132,445 to settle
the claim. Empire also made supplemen-
tal payments of $6,596 and $24,082 over
the next eighteen months. Based on Em-
pire's handling of the claim, the Coxes
sued Empire for bad faith under Kentucky
statutory and common law. No aspect of
the claim-adjustment process, however—
including the amount of the initial pay-
ment and the delayed payment of the sup-
plemental checks—reflected bad faith by
Empire. The company was therefore
properly granted summary judgment on
the Coxes' claim.

In 2005, the Coxes bought a house,
which cost under $100,000, to use as a
rental property. The Coxes soon began
renovations and borrowed $120,000 from a
bank. In January 2008, the owner of the
loan, HomeEq Servicing (HomeEq), pur-
chased from Empire an insurance policy
with a $238,150 limit. Under this policy,
which was administered by Empire's pro-
gram manager ZC Sterling Insurance

Agency (ZC Sterling), the Coxes were additional named insureds. The policy covered only the dwelling.

The Coxes' house burned down on April 18, 2008, while the Coxes were out of town. The Coxes were not living in the house at the time. William Cox reported the fire two days later and a claim was opened. On April 22, ZC Sterling assigned the file to claim representative Rick Maxwell; appraiser Sheryl Hester of Audit Services, Inc. (ASI); independent field adjuster Rick Parks of Cunningham Lindsey; and Rebecca Smith, a cause-and-origin expert with PT & C Forensic Consulting. During the claim-adjustment process, ZC Sterling worked on the Coxes' claim with Smith, Parks, and several ASI employees, including Hester.

The first round of the claim investigation began on April 25 and ended on July 21, when Empire issued a check to HomeEq and the Coxes. On April 25, Parks inspected the site and told Hester that the house was "a total loss." Parks also talked with William Cox about the house, receiving rough estimates from Cox about the dimensions of the house and the layout of the rooms. Cox did not give Parks pre-fire photographs or any other documentation concerning the house.[1] On one line in Parks' initial report, Parks told Hester that the "estimated loss" was $238,000. Parks' report also promised that Parks would prepare and deliver to ASI a "detailed estimate," complete with "the replacement cost and actual cash value figures." On April 25, the date of Parks' on-site inspection, cause-and-origin expert Smith also investigated the fire. Smith initially reported that the fire was caused by arson. This conclusion was based in part on Smith's encounter with an uniden-tified man, who told Smith that "someone set this home on fire." In Smith's final report on May 16, however, Smith concluded that she could not determine the cause of the fire due to the extent of the damage.

In preparing her final report, Smith interviewed William Cox, and during this interview she learned information about the extent of the renovations. Cox told Smith that the renovations consisted of "basic remodeling" that he did himself. Cox further explained that the renovations included painting, repairing holes in walls, installing sheetrock, and other basic repairs.

Several days after Smith completed her final report on the cause of the fire, Parks, the independent adjuster, completed his detailed estimate. Parks estimated that it would cost $160,684 to rebuild the house, and that the actual cash value (ACV) of the house—which is what the Coxes and HomeEq would receive if the Coxes did not rebuild—was $147,881. ASI audited Parks' estimate and prepared another estimate, which reflected a rebuilding cost of $147,557 and an ACV of $132,945. These were the figures that Empire used in issuing the initial payment. On July 21, just three months after the Coxes reported the claim, Empire issued a check for $132,445 to HomeEq and the Coxes.

On August 11, William Cox attempted to reach claim representative Maxwell, leaving a voicemail and asking Maxwell to return the call. That same day, Maxwell returned Cox's call. *Id.* Cox did not call back until September 15, over a month later. Maxwell, again, returned the call on the same day and was unable to reach Cox. An ASI employee and Cox finally connected ten days later, on September 25. Cox

---

1. The Coxes did submit receipts related to some of the renovation expenses, but the Coxes did not do so until the spring of 2009, well after Empire's initial claim payment in July 2008.

indicated that the claim payment was too low and that he had given the rebuilding estimate to a contractor, who could talk with the claims adjusters about the scope of repairs. Although Cox said that he would call back soon with the contractor's contact information, he did not do so. ASI employees called Cox several times to follow up, with no success. On October 9, ASI spoke with Cox, who now said that he did not have a contractor. Cox also told ASI that in the renovations before the fire, he had added wood floors and a $3,000 front door to the house, both of which were changes that were not reflected in the original rebuilding estimate. Cox again said that he would be in touch soon. After at least one more unreturned follow-up call from ASI to Cox, ASI connected with Cox on November 5. During this conversation, Cox told ASI that he had given the estimate to a contractor, Rick Crum, and that he would ask Crum to contact ASI.

Two months later, on January 8, 2009, Cox sent ASI an estimate with a rebuilding cost of $214,771. That estimate, which was assembled by Cox, incorporated an estimate for labor from Crum and an estimate for building expenses from a hardware company. ASI faxed the original estimate to Crum and, as a next step, planned to talk with Crum to reach an agreed-upon estimate. During January and February, ASI called Crum at least six times to no avail.

Also in February 2009, ASI prepared a second rebuilding estimate based on previous conversations with William Cox. This estimate changed the quality setting of the house from "average" to "above average," changed the floors from carpet to hardwood, and accounted for debris removal. These changes yielded a rebuilding estimate of $212,266. Upon reviewing this new estimate, however, one of ZC Sterling's claims managers told claim representative Maxwell that the company needed evidence to support the changes. At the end of February, Cox sent ASI a receipt for hardwood flooring that Cox had purchased before the fire. In March, Cox sent several other receipts, including receipts for vinyl siding and other standard building items like drywall, nails, and glue. These receipts added up to almost $24,000. Maxwell concluded that the receipts did not support the conclusion that the house was of above-average quality. Maxwell accordingly sent a letter to the Coxes on April 28 advising that there would be no changes to the original estimate, except that "in the spirit of compromise," the Coxes would receive a $6,596 check for wood flooring, even though there was no proof that the flooring was installed.

Soon after receiving the supplemental check, the Coxes filed a complaint with Kentucky's Department of Insurance (DOI). In a June 2009 conversation with a DOI investigator, a ZC Sterling employee told the investigator that the Coxes had neither submitted a formal estimate from a contractor nor provided documentation to support using high-quality rebuilding materials. The investigator responded that he would tell the Coxes to submit a formal estimate from their contractor. After not hearing from the Coxes for over a month, Maxwell sent a letter on July 31, reminding the Coxes that ZC Sterling had not received documentation or a contractor's estimate. The Coxes did not respond for another month, and William Cox then played phone tag with Maxwell for two more weeks.

On September 9, 2009—over thirteen months after Empire's initial payment— William Cox told Maxwell that he wanted to use another contractor, James Stepp, in the rebuilding process. Based on what Cox told Stepp about the house, Stepp prepared a rebuilding estimate of $203,436.

Over the next few weeks, the adjusters met with Stepp to discuss the scope and cost of repairs. Stepp and the adjusters agreed on everything except the foundation of the house. In November, ZC Sterling asked a structural engineer to examine the foundation for fire damage. Early in that month, independent field adjuster Parks created a revised ACV of $163,624, which was approximately $24,000 higher than Parks' first estimate in May 2008. According to Parks, this difference was based primarily on new information about the house that Parks had received from the Coxes and Stepp. In early December 2009, Stepp and ZC Sterling agreed on a revised ACV of $163,624. Empire then issued a check to HomeEq and the Coxes for $24,082, which represents the difference between the revised ACV figure and the sum of the two payments already made. This final payment was issued twenty-one months after the fire and eighteen months after the initial payment.

In November 2013, the Coxes filed suit against Empire in state court, asserting a bad-faith claim under Kentucky common law and under the Kentucky Unfair Claims Settlement Practices Act, Ky.Rev.Stat. Ann. § 304.12–230. The Coxes also asserted another claim not relevant here. After Empire removed the case to federal court, the district court granted summary judgment to Empire. The court reasoned that none of Empire's actions, including the initial payment that was substantially lower than the final ACV, qualified as "outrageous" conduct. The Coxes appeal.

Empire was properly granted summary judgment, as the company did not act outrageously by investigating and adjusting the Coxes' insurance claim. Proving bad faith under Kentucky common law or § 304.12–230 requires an insured to show that: (1) the insurer was obligated to pay

the claim; (2) the insurer lacked a reasonable basis for denying the claim; (3) and the insurer knew that it lacked a reasonable basis for denying the claim or acted with reckless disregard for whether there was a reasonable basis for denying the claim. *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky.1993) (citation omitted). Kentucky's evidentiary standard is high: a plaintiff must show that the "insurer has engaged in outrageous conduct" and that this conduct was "driven by evil motives or by an indifference to its insureds' rights." *United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky.Ct.App.2003); *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, 502 Fed.Appx. 425, 428 (6th Cir.2012). In this case, no aspect of the claim-adjustment process, including the amount of the initial payment, the delays in payment, alleged misrepresentations by Empire, or Empire's assistance of the Coxes, satisfies this high standard.[2]

First, there is no evidence that Empire intentionally or recklessly underpaid the Coxes' insurance claim. The amount of the initial payment in July 2008—$132,445—was not so low relative to the final ACV of $163,624 as to reflect bad faith. Nor did the Coxes prove that the house was worth more than this amount. The first element of a bad-faith claim requires the insured to prove the amount of loss. "[Although] [t]he insurer may choose to accommodate its insured or a claimant by providing appraisals, ... its legal responsibility is limited to payment upon proof of loss." *Wittmer*, 864 S.W.2d at 892. The Coxes did not provide any evidence of the condition of the house, such as receipts or photographs, during the ten months following the fire. When Parks and ASI prepared their initial rebuilding estimates, they had only William Cox's verbal de-

---

**2.** Given this conclusion, we do not address the Coxes' arguments regarding damages.

scription of the layout of the house. That description provided little evidence of the amount of loss. Also supporting the amount of the initial payment is Cox's statement to cause-and-origin expert Smith in May 2008 that the renovations consisted only of basic remodeling. The information available to the claims adjusters in the months following the fire thus supported assigning a rebuilding cost of $147,577 and an ACV of $132,945 instead of higher figures. In addition, nothing about the supplemental check of $24,082 indicates earlier bad faith, as this payment was attributable mostly to two factors: first, new information from the Coxes concerning items not included in the original estimate, such as the size of the house; and second, the Coxes' hiring of a contractor, James Stepp, who was available to work with the adjusters regarding rebuilding costs.

It is true that by March 2009, eleven months after the fire, Empire had received from the Coxes receipts totaling approximately $24,000. These receipts do not change this analysis. With the exception of the hardwood floors and the vinyl siding, the expenses were for standard building items like drywall, nails, and glue. Empire's decision not to incorporate these costs into a rebuilding estimate, which would presumably account for standard building costs, was reasonable. Moreover, even though the Coxes were unable to prove that the hardwood floors were installed in the house at issue here, Empire nonetheless issued a $6,596 check for the floors. In sum, because Empire was not required to pay until the Coxes proved the amount of loss, see *Wittmer,* 864 S.W.2d at 892, and because Empire did not act outrageously by issuing an initial payment of $132,445, the difference between that amount and the final ACV of $163,624 does not support a bad-faith claim.

Similarly, none of the other figures that the Coxes point to—the insurance policy limit of $238,150, Parks' first estimate of the loss in April 2008, and ASI's tentative rebuilding estimate in February 2009—provides evidence of underpayment. As for the policy limit, the Coxes were not necessarily entitled to $238,150 in the event of a fire. The policy provides that the Coxes would be entitled to the lesser of $238,150, the cost to rebuild the house, or the ACV if they chose not to rebuild. As explained above, the Coxes did not prove that it would cost $238,150 to rebuild. In fact, the Coxes' highest estimate—William Cox's handwritten estimate in January 2009—was almost $24,000 less than the policy limit. The $238,150 limit thus provides no evidence of bad faith. Nor does Parks' first estimate of the loss in an April 2008 report, which listed an estimated loss of $238,000. The same report promised that Parks would "work[ ] on a detail[ed] estimate to rebuild the house," and would "forward the replacement cost and actual cash value figures to [ZC Sterling] when [the estimate is] completed." This language makes clear that Parks' initial loss figure provides no evidence of deliberate or reckless underpayment. Finally, ASI's revised estimate of the rebuilding cost in February 2009 also does not support the argument that Empire underpaid the claim. That estimate, which listed a rebuilding cost of $212,266 and an ACV of $188,119, was based on a change in the quality setting of the house. ZC Sterling ultimately rejected this estimate and returned to the original figures because the Coxes were unable to prove that the house was in above-average condition. The claims adjusters reasonably concluded that the receipts for standard building materials, vinyl siding, and hardwood floors, were not enough to prove that the house was of above-average quality. The

Coxes thus cannot prove bad faith on the basis that Empire underpaid the claim.

Nor do any of the delays involved in the claim-adjustment process support a finding of bad faith. Even though the second supplemental payment was made twenty-one months after the fire, the record indicates that the Coxes were responsible for most of the delay between the initial payment and the two supplemental payments. The Coxes proved difficult to reach in August, September, and October 2008. Even after William Cox told ASI in early November 2008 that his contractor, Rick Crum, would be in touch, Crum did not contact ASI. Nor did Crum answer many of the phone calls from ASI and Maxwell in January and February 2009. The summer of 2009, too, was marked by delayed responses from the Coxes and Crum. In sum, there is no period of substantial delay that is attributable to foot-dragging by the claims adjusters.

Even if some small amount of delay was attributable to Empire and its claims adjusters, the Kentucky courts have recognized that delay—even if caused by neglect—is not sufficient to prove a bad faith claim. "[M]ere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky.1997). In *Bult*, for instance, a case involving the death of the plaintiffs' minor daughter, the Kentucky Court of Appeals held that an insurer was entitled to judgment as a matter of law on a bad-faith claim. 183 S.W.3d at 190. The court reasoned that "a fair measure of the [ten-month] delay [was] attributable to the[ ] [plaintiffs'] own conduct" and that the plaintiffs "made no effort to submit the documentation that [the claims adjuster] requested." *Id.* Applying *Bult*'s reasoning to this case yields the same result. Even assuming that some small portion of the delay in making the two supplemental payments was attributable to Empire, there is no evidence of harassment, deception, or other outrageous conduct.

None of the Coxes' arguments to the contrary proves that any of the delay involved here was outrageous. First, the three-month delay between William Cox's report of the fire on April 20, 2008, and the initial payment on July 21 was not outrageous. Soon after the fire, ZC Sterling assigned several experts to investigate the claim, reviewed the experts' reports, and interviewed William Cox. Empire also informed the Coxes of the amount of the rebuilding estimate by June 10, 2008, less than two months after the fire, and suggested that the Coxes review the estimate with a contractor. Second, Empire did not intentionally or recklessly delay the second supplemental payment in January 2010 by closing the Coxes' file in November 2008. Empire did not close the file in an attempt to shortchange the Coxes or delay their payments, but because the claims adjusters could not reach Crum or the Coxes. *Id.* Third, that Empire did not assign a structural engineer to analyze the foundation of the house until November 2009 also does not suggest bad faith. Empire sent an engineer to the house immediately after the Coxes' second contractor, James Stepp, indicated that this was necessary.

The Coxes also cannot prove bad faith by alleging that Empire misrepresented pertinent facts or policy provisions to the Coxes. The Coxes argue that Empire systematically misrepresented that the Coxes needed a licensed contractor under the insurance policy. The record, however, does not support the conclusion that Empire made this misrepresentation. In William Cox's deposition, Cox testified that Empire "wanted a licensed contractor" to do an estimate for Cox. But this does not indicate that Empire would work with the Coxes only if they had a contractor. What

is more, Empire issued the initial payment in July 2008 without the Coxes' having engaged a contractor, and Empire also issued the first supplemental check for the hardwood floors without first negotiating with a contractor. Another statement in the claim file, during an October 2009 conversation between Maxwell and William Cox, also does not suggest bad faith. In that conversation, Maxwell "requested a licensed contractor" to work with the adjusters. The fairest reading of this statement is that Maxwell was attempting to move along the process by suggesting that Cox engage someone who could help Cox prove the amount of loss, which was the Coxes' duty under Kentucky law. The statement does not suggest that Maxwell was attempting to trick the Coxes into believing that the insurance policy required a contractor, and that by doing so Maxwell intended to drag out the claim-adjustment process.

Similarly, the record does not indicate that in the summer of 2009, Empire misrepresented to the Kentucky DOI that Empire had learned new facts regarding the house. In the Coxes' memorandum opposing summary judgment, the Coxes agreed with Empire that the changes incorporated into the final ACV—which was created by Parks in November 2009—were based on "information that the plaintiffs could have provided, but failed to provide, to Empire since April 2008." The Coxes also agreed to Empire's list of information that was provided late in the process, including a change in the size of the house from 1,197 to 1,476 square feet. This argument about alleged misrepresentations, too, fails to establish bad faith.

The Coxes' final two arguments regarding bad faith—discrimination and lack of assistance from Empire—are similarly without merit. As for the discrimination argument, no evidence suggests that Empire treated the Coxes differently because they are from Eastern Kentucky. The Coxes rely on a statement in the claim file by Smith, the cause-and-origin expert, who said that she had lived in the Coxes' town and that the area was "extremely economically challenged." This statement does not indicate discrimination. At the time of this statement, Smith had reason to believe that the fire was caused by arson, and her statement in the claim file reflects her investigation into the cause of the fire. The fact that Empire assigned a cause-and-origin expert to this claim likewise does not support a discrimination argument. The Coxes have offered no evidence suggesting that it is unusual or unreasonable to assign this type of expert to a fire claim. Finally, that Smith's initial report—which preliminarily assessed the cause of the fire as arson—mentioned that she would pull the Coxes' financial records does not support a discrimination argument. As noted above, Smith had a reasonable basis for suspecting that this case might involve arson. Moreover, any inquiry into the Coxes' financials would have stopped several weeks after Smith's initial report, when Smith concluded that she could not determine the cause of the fire. The allegations of discrimination fall short.

Equally unavailing is the Coxes' argument that the claims adjusters did not adequately assist the Coxes during the process. Multiple employees from ASI and ZC Sterling made repeated attempts to contact the Coxes and their contractors throughout the claim-adjustment process. At various points, these employees also explained the rebuilding process to William Cox. Empire's conduct in this respect, then, was not in bad faith.

The judgment of the district court is affirmed.