BITUMINOUS CASUALTY
CORPORATION
Appellant,

v.

KENWAY CONTRACTING, INC., Judy
Turner, Neal Turner and Integra
Bank, N.A. Appellees.

No. 2005–SC–000013–DG.

Supreme Court of Kentucky.

June 21, 2007.

As Modified Dec. 21, 2007.

As Modified on Denial of Rehearing
Jan. 24, 2008.

and its Commercial General Liability (CGL) policy carrier, Bituminous Casualty Corporation (BCC). The Warren Circuit Court, in an opinion affirmed by a split decision of the Court of Appeals, concluded BCC had a duty to defend and indemnify Kenway under its CGL policy for damage caused by a Kenway employee to property owned by Neal and Judy Turner.

On appeal, this Court is asked to determine: (1) whether the definition of an accident includes intentional acts of Kenway's employee that led to the damage; and (2) if the damage falls within the scope of coverage, is that coverage precluded under either of the business risk exclusions contained in Kenway's CGL policy. Having concluded that the definition of accident includes intentional acts that lead to unintended or unexpected results; and further, that the business risk exclusions are ambiguous when considered in light of the circumstances present here, we find BCC has a duty to defend and indemnify its insured. For these reasons, we affirm.

Pamela Adams Chesnut, Robert E. Maclin, III, McBrayer, McGinnis, Leslie & Kirkland, PLLC, Lexington, Counsel for Appellant.

J. Brent Travelsted, Lanna M. Kilgore, Bowling Green, Counsel for Appellee, Kenway Contracting, Inc.

Larry F. Hinton, Reynolds, Johnston, Hinton, Thomas & Pepper, LLP, Bowling Green, Counsel for Appellees, Judy Turner, Neal Turner and Integra Bank, N.A.

CUNNINGHAM, Justice.

## I. INTRODUCTION

This case involves an insurance coverage dispute between Kenway Contracting, Inc.,

## II. FACTUAL BACKGROUND

Neal and Judy Turner owned a single story residential structure with attached carport in Bowling Green, Kentucky. The Turners desired to convert the structure for commercial use. To that end, Neal Turner contacted Kenneth Allen of Kenway Contracting, Inc. Kenway, a Kentucky corporation, is involved in construction, demolition, and material handling in the Bowling Green area. Kenneth Allen is the President of Kenway, while his son Joseph 'Jody' Allen is the Vice-President.

Initially, Neal Turner met with Kenneth Allen at the building site to discuss Turner's plans. Once the Turners obtained a plan from an engineering firm, Turner met with Jody Allen to review the specific re-

quirements. Based on this discussion, Jody Allen submitted a written proposal, accepted by the Turners, which indicated Kenway would remove the attached carport, remove the concrete pad beneath the carport, and remove the old asphalt driveway. Kenway would then lay a new asphalt parking lot, allowing for conduit for future electrical wiring. Kenway would also pour a new concrete sidewalk leading from the parking lot to the main entrance. Both the discussions and the proposal made it clear the one-story residential structure was not involved in Kenway's work.

In preparation for the work that was to begin on May 8, 2002, Kenneth Allen met with Dwight McComas in the company break room. McComas, a Kenway employee, was a heavy equipment operator. Kenneth Allen instructed McComas to meet Jody Allen at the Turner property with a trackhoe at 1:00 p.m. to assist Jody with the removal of an attached carport.

Jody Allen testified that he contacted McComas by phone on the morning of May 8th and informed McComas that he would meet him at the Turner property after lunch. Jody Allen admitted that he did not discuss details of the demolition work with McComas during this call. McComas testified that Kenneth Allen told him he was to perform a teardown for Jody Allen at the Turner property.

McComas transported the trackhoe to the Turner property. When McComas called Jody Allen to let him know he had arrived, Jody indicated he would meet him at the site shortly. McComas unloaded the trackhoe and began demolition operations. Jody Allen arrived within five to seven minutes after McComas began his work. McComas testified that he knew something was wrong when Jody Allen got out of his truck and placed both hands to his head. By the time Jody Allen arrived,

the carport and over half the residential structure had been brought to the ground. Jody Allen, having stopped McComas from taking further action, called Kenneth Allen, Neal Turner, and David Sears.

Sears was the Allens' agent with Center of Insurance of Bowling Green. Kenway obtained a CGL policy through Sears. The policy, covering the period of July 15, 2001 to July 15, 2002, was offered through BCC. Kenway's CGL policy, with an annual premium of $35,904.46, was in effect on May 8, 2002.

On May 9, 2002, BCC received notice of a claim through Sears. On May 13, 2002, BCC sent a reservation of rights letter to Kenway. This was followed on May 31, 2002, with another letter indicating that, based on their initial investigation, BCC felt there was no coverage under the CGL policy. The letter, signed by Senior Claims Representative Michael L. Petty, indicated several exclusions applied to the incident and would preclude coverage.

On June 5, 2002, BCC sent a detailed letter explaining its determination that the CGL policy offered no coverage. BCC indicated that it questioned whether the circumstances met the definition of occurrence. Further, BCC believed one or more of the following exclusions applied:

2. Exclusions

 a. Expected or Intended Injury

 b. Contract Liability ... obligated to pay damages by reason of the assumption of liability in a contract or agreement.

 j. Damage to property

 (4) Personal property in the care, custody or control of the insured;

 (5) That particular part of real property on which you ... are performing operations, if ... property damage arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it.

Keith Baker, BCC's claims supervisor, signed this letter.

On September 23, 2002, Kenway filed a declaratory judgment action in the Warren Circuit Court. Following discovery, the parties filed cross motions for summary judgment. Shortly after the briefing period, the court was faced with a motion to intervene filed on behalf of the Turners and Integra Bank, N.A.[1] Over the objection of BCC, the court allowed the Turners and Integra Bank, N.A., to intervene. In a subsequent order, the court indicated that the intervening parties would be allowed to litigate their damage claims once the coverage issue was decided. As a result, the Turners and Integra Bank, N.A., have not presented arguments as to the issues surrounding coverage under the CGL policy.

The Warren Circuit Court, on October 24, 2003, entered summary judgment in favor of Kenway. The court ruled that as the damages had not been the plan, design, or intent of the insured, they fell within the definition of accident. Further, the court reasoned that the damages resulted from a communication disconnect, not faulty workmanship. Finally, the court noted that "the sweeping property damage caused by its agent McComas was decidedly unintended and unexpected" from the standpoint of the insured. Thus, the court concluded exclusions 2j(5) and 2j(6) did not apply. From this order, BCC timely appealed.

On December 10, 2004, the Court of Appeals, in a split decision, affirmed the trial court in its finding that BCC was obligated to defend and indemnify Kenway. Relying heavily on this Court's decision in *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273 (Ky.1991), the Court of Appeals noted that where terms are undefined and have no technical definition at law, the plain meaning of the word is used. Further, the Court of Appeals noted that in *Brown Found.* this Court had rejected the application of tort principles, such as foreseeability, in the interpretation of insurance contracts. The Court of Appeals recognized that while the act causing the damages may be intentional, the consequences may be unintended and unexpected on the part of the insured. Such was the case here. As to the business risk exclusions, the majority of the Court of Appeals felt exclusion 2j(6), poor workmanship, had no application. In concluding exclusion 2j(5) was inapplicable, the majority relied on *Columbia Mut. Ins. Co. v. Schauf*, 967 S.W.2d 74 (Mo.1998). BCC sought discretionary review from this opinion.

### III. STANDARD OF REVIEW

■ In Kentucky, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rules of Civil Procedure (CR) 56.03. Further, "the record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991).

1. Integra Bank, N.A., held the mortgage on the Turners' property.

## IV. ANALYSIS

At the heart of this appeal lies the interpretation and application of the terms of Kenway's CGL policy. As a general rule, the construction and legal effect of an insurance contract is a matter of law for the court. *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky.1992)("The construction as well as meaning and legal effect of a written instrument, however compiled, is a matter of law for the court."). As noted by this Court in *Brown Found.*, Kentucky has consistently recognized that an ambiguous policy is to be construed against the drafter, and so as to effectuate the policy of indemnity. 814 S.W.2d at 279, *citing Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984). *See also Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164 (Ky.1992). In *Wolford*, this Court's predecessor made it clear that ambiguous language must be liberally construed so as to resolve all doubts in favor of the insured. 662 S.W.2d at 838. "[W]here not ambiguous, the ordinary meaning of the words chosen by the insurer is to be followed." *Brown Found.*, 814 S.W.2d at 279, *citing Washington Nat'l Ins. Co. v. Burke*, 258 S.W.2d 709 (Ky.1953). Or stated another way, words which have no technical meaning in law, must be interpreted in light of the usage and understanding of the common man. *See Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205, 206 (Ky. 1986).

### A. Purposes behind Commercial General Liability Policies

As we consider the policy *sub judice*, we are mindful that this Court has recognized that "[t]he primary purpose of a comprehensive general liability policy is to provide broad comprehensive insurance." *See Brown Found.*, 814 S.W.2d at 278. Further, "the very name of the policy suggests the expectation of maximum coverage." *Id.* To that end, this Court stated that "[a]ll risks not expressly excluded [under the CGL policy] are covered, including those not contemplated by either party." *Id.*

In *Brown Found.*, this Court recognized that "[t]he insurer's responsibility under a comprehensive policy is not measured by its intent." *Id.* at 277. Rather, "[t]he insured is entitled to all coverage he may reasonably expect under the policy." *Id.* As it relates to exclusions in a CGL policy, this Court made it clear that "[o]nly an unequivocal, conspicuous and plain and clear manifestation of the company's intent to exclude coverage will defeat this expectation." *Id.*

### B. Scope of Coverage Under Kenway's Commercial General Liability Policy

There are two steps to our determination as to scope of coverage under Kenway's CGL policy. First, we must determine whether the circumstances surrounding the damage to the Turners' property falls within the definition of "occurrence" as set out in the policy. If it does, we must then determine whether either of the business risk exclusions operates to preclude coverage.

### 1. Accident includes intentional acts that cause unexpected or unintended results from the standpoint of the insured

Kenway's CGL policy, under Section I—Coverages, indicates BCC will provide coverage for property damage which "the insured becomes legally obligated to pay[.]" The policy goes on to say that "[t]his insurance applies to ... "property damage" only if the property damage "is caused by an "occurrence" that takes place in the "coverage territory"; and "occurs

during the policy period." The policy, in Section V—Definitions, defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident" is not defined in Kenway's CGL policy.

BCC argues the Court of Appeals erred in finding the intentional acts committed by McComas qualified as an "occurrence" under the CGL policy. BCC notes that McComas, an employee of Kenway, was acting within the scope of his employment when he intentionally knocked down the Turners' residence. Thus, BCC argues McComas is an insured. As McComas believed he was supposed to tear down the entire property, the resulting damage was neither unintended nor unexpected from his point of view. Further, BCC suggests this result was foreseeable from Kenway's perspective as the Allens sent McComas out to the site without proper instructions and without proper supervision. Under these circumstances, BCC argues the damage did not result from an accident.

BCC's argument that we view this issue from the perspective of McComas is without merit. If this claim had sought recovery from McComas, then we would consider whether he had been acting within the scope of his employment and thus was an insured under the policy. However, this case does not involve a claim of liability against McComas. Rather, the claim is against Kenway. As a corporation, Kenway can act only through its officers. Thus, we must consider whether the damage to the Turners' property was intended or expected from the perspective of the Allens, Kenway's officers.

In *Brown Found.*, this Court recognized that "occurrence" is to be "broadly and liberally construed in favor of extending coverage to the insured." 814 S.W.2d at 278. Further, this Court adopted the majority rule when it concluded "that if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable." *Id.* In rejecting reliance on the foreseeability standard, this Court in *Brown Found.* reiterated its belief that it is inappropriate to inject tort principles into the construction of insurance contracts. *Id.* at 279. *See also Fryman v. Pilot Life Ins. Co.,* 704 S.W.2d at 206 (principles of tort law and criminal law have no application in contract interpretation).

BCC, citing *Fryman,* stresses the fortuitous aspect of the meaning of accident. In *Fryman,* this Court stated, "An accident is generally understood as an unfortunate consequence which befalls an actor through his inattention, carelessness or perhaps for no explicable reason at all." *Id.* Further, "[t]he result is not a product of desire and is perforce accidental." *Id.* This Court went on to recognize "[c]onversely, a consequence which is the result of plan, design or intent is commonly understood as not accidental." *Id.* Stated another way, an accident "denotes something that does not result from a plan, design, or intent on the part of the insured." *Stone v. Kentucky Farm Bureau Mut. Ins. Co.,* 34 S.W.3d 809, 812 (Ky.App. 2000). The damage to the Turners' property was unexpected and unintended by the insured. It was not the plan, design, or intent of the insured. Therefore, the fortuity requirement in the definition of accident is satisfied.

Kenway correctly notes that there was no evidence presented to support a claim that the Allens expected or intended the damages that occurred. Instead, the evidence, when taken in a light most favorable to the Allens, supports the conclusion that McComas had been informed that he

was to assist Jody Allen in a partial teardown involving only the carport, and that he was to meet Jody Allen at the Turner's property. Thus, the evidence does not support a claim that it was the Allens' plan, design, or intent that McComas begin demolition on his own without waiting for Jody Allen to arrive, or that McComas demolish the residence in total. Nor does the evidence support a finding that the Allens actually and subjectively intended the damage to the Turners' property. Under these circumstances we conclude the definition of accident has been met. Further, as we have found this to be an accident, it satisfies the definition of "occurrence" as set out in the policy.

## 2. The business risk exclusions do not operate to preclude coverage in these circumstances

As noted previously, a CGL policy covers all risks not expressly excluded by its terms. *See Brown Found.,* 814 S.W.2d at 278. Thus, having concluded the damage to the Turners' property fell within the CGL policy, we must now consider whether the coverage is precluded under either of the exclusions relied on by BCC. These exclusions are known as the business risk exclusions.

The purpose of the business risk exclusions in CGL policies is to allocate the risk between the insured and insurer as it relates to damages arising out of the insured's business. The business risk exclusions are intended to distinguish between contract liability and tort liability. *See Thommes v. Milwaukee Ins. Co.,* 641 N.W.2d 877, 881 (Minn.2002). These exclusions "are based on the apparently simple premise that [a CGL policy] is not intended as a guarantee of the quality of an insured's work product." *Schauf,* 967 S.W.2d at 77. Thus, the risk that the product provided or the work performed

will not meet contract requirements is a risk not covered under the policy. *Thommes,* 641 N.W.2d at 880. *See also Standard Constr. Co., Inc. v. Maryland Cas. Co.,* 359 F.3d 846, 852–53 (6th Cir.2004).

### Exclusion 2j(5)

Exclusion 2j(5) states that coverage does not apply to property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations[.]"

BCC argues that exclusion 2j(5) applies and precludes coverage. BCC reasons that McComas, the insured, was performing operations on the residence when the damage occurred. Citing *Schauf,* BCC asserts that the exclusion applies to that part of real property on which the insured is performing operations, not on which the insured did perform operations, will perform operations, or has contracted to perform operations. 967 S.W.2d at 80. Relying on this principle, BCC argues the coverage is not determined based on the contract. In effect, BCC argues that it is immaterial whether McComas was operating outside the scope of the contract.

Exclusion 2j(5) has been considered by several cases. In *Schauf,* the insured had signed a subcontract to paint, stain, or lacquer, all surfaces inside and outside of a house. 967 S.W.2d at 76. Schauf, who had just finished spraying lacquer on the kitchen cabinets, was running lacquer thinner through his sprayer when the generator caused a fire that resulted in extensive damage throughout the house. *Id.* The Missouri Supreme Court concluded the phrase "that particular part of real property" was subject to more than one interpretation: (1) it could mean only the cabinets; or (2) it could mean the entire area Schauf

was scheduled to work. *Id.* at 80. The court interpreting the clause so as to strictly construe the exclusion, found it applied to the kitchen cabinets. *Id.* In this fashion the court narrowly applied the plain language of the exclusion while giving effect to the purpose of the business risk exclusion. *Id.* at 80–81.

In the *Thommes* case, the Minnesota Supreme Court also reached the conclusion that the clause was ambiguous. 641 N.W.2d at 883. In *Thommes*, the insured had contracted to clear and grub a piece of property for the purposes of development. *Id.* at 879. As the result of a mix-up, the insured's employees cleared and grubbed the property adjacent to that which they had contracted to work on. *Id.* Milwaukee Insurance claimed the phrase should be read so as to apply to any real property upon which the insured performs operations, including that of third parties. *Id.* at 883. Thommes argued the clause should be interpreted so as to only apply to the real property it was supposed to have performed operations under the contract. *Id.* Recognizing that the phrase "that particular part of real property" and the term "operations" were not defined in the policy, and that two interpretations had been presented within the plain meaning of the language, the court found an ambiguity existed. *Id.*

As we consider the application of exclusion 2j(5) to the case *sub judice*, we begin by noting that the insured in this case against whom the claim was brought is Kenway and not McComas. As with *Thommes, supra*, we note that the phrase "that particular part of real property" and the term "operations" are not defined in the CGL policy. The Allens suggest that from their perspective, operations should be limited to the carport. BCC argues operations should be determined from the perspective of McComas, and real proper-

ty should extend to any real property upon which operations are occurring. Given that the policy contains terms that are not defined, and given that each party has suggested a reasonable interpretation in light of the plain meaning of the words used, we conclude the policy is ambiguous. In keeping with the principle that "[a]n ambiguous policy is to be construed against the drafter, and so as to effectuate the policy indemnity[,]" we conclude exclusion 2j(5) does not operate to preclude coverage.

*Exclusion 2j(6)*

 Exclusion 2j(6) states that the insurance does not apply to property damage to "that particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it."

BCC argues that exclusion 2j(6) applies to bar coverage. In support of its claim, BCC points out that McComas performed operations on the residence itself. Based on these operations, the residence will have to be repaired or replaced. Further, BCC argues the phrase "your work" includes warnings and instructions. BCC argues that the Allens' failure to instruct and supervise McComas led to the damage that must be repaired. For these reasons, BCC argues exclusion 2j(6) applies.

In *Standard Constr. Co., Inc. v. Maryland Cas. Co.*, the court concluded exclusion 2j(6) was directed at the manner of insured's work. 359 F.3d at 851. In that case the insured, believing it had a contract right to do so, dumped debris from road construction on private property. *Id.* at 848. In fact, the contract was not valid. *Id.* In concluding exclusion 2j(6) did not apply, the court reasoned that it could be interpreted so as to apply to the manner of dumping rather than the location. *Id.* at 851. As there was no allegation the man-

**642**

ner of dumping was improper, the exclusion did not operate to bar coverage. *Id.*

Exclusion 2j(6) was also considered in the *Thommes* case. In that case, the court concluded the exclusion could be interpreted in two ways: (1) applying to work performed on the wrong property; or (2) applying only to the manner of work with location playing no part. 641 N.W.2d at 883–84. The insured in *Thommes* cleared and grubbed land adjacent to that which it had contracted to do the work on. *Id.* at 879. The court noted that under the second interpretation exclusion 2j(6) would not apply because there had been no allegation that the work was performed in a faulty manner. *Id.* at 884.

The above cases provide insight into the applicability of exclusion 2j(6) to the case *sub judice.* BCC argues the exclusion applies both because McComas, as an insured, performed work on the residence, and because the Allens failed to instruct and supervise McComas. BCC's first argument fails because Kenway and not McComas is the insured for purposes of the Turners' claim. The later argument is also without merit for purposes of summary judgment. The evidence, when viewed in a light most favorable to the Allens, supports the conclusion that McComas was instructed that he would be performing a partial teardown involving only the carport, and that he was to meet Jody Allen at the Turners' property.

Turning to the language of exclusion 2j(6), we find that it is subject to multiple interpretations. As in the *Thommes* case, the plain meaning of the language could be interpreted as: (1) applying to work performed properly but in the wrong location, thus requiring repair or replacement; or (2) applying only to the manner of work that was performed. 641 N.W.2d at 883–84. Under the second interpretation exclusion 2j(6) would not apply because there

had been no allegation that McComas's work on the carport was faulty in any manner. *Id.* at 884. *See also Standard Contr. Co., Inc. v. Maryland Cas. Co.,* 359 F.3d at 851. Once again, in keeping with the principle that "[a]n ambiguous policy is to be construed against the drafter, and so as to effectuate the policy indemnity[,]" we conclude exclusion 2j(6) does not operate to preclude coverage.

This conclusion is supported by the holding in *Employers Mut. Cas. Co. v. Pires,* 723 A.2d 295 (R.I.1999). As interpreted in *Pires,* exclusion 2j(6) would apply only if the damage to the residence occurred during a necessary stage in the partial teardown of the carport. Exclusion 2j(6) would not preclude coverage if the damage resulted from an accident. 723 A.2d at 299. As the damage in this case was neither expected nor intended from the perspective of the insured, it qualifies as an accident. Thus, exclusion 2j(6) would not operate to preclude coverage.

### V. CONCLUSION

As liability in this case is being sought against Kenway, we must view these issues through the perspective of Kenway's officers, the Allens. Thus, while McComas's actions were intentional, the damage that resulted to the Turners' property was neither expected nor intended from the perspective of the Allens. This falls within the plain meaning of the term accident and therefore meets the definition of occurrence under the CGL policy.

Turning to the application of the business risk exclusions, we concluded they did not operate to preclude coverage. The plain language in exclusions 2j(5) and 2j(6) is subject to multiple interpretations when considered in light of the circumstances of this case. In light of the principle that "[a]n ambiguous policy is to be construed against the drafter, and so as to effectuate

the policy indemnity[,]" we conclude neither exclusion operates to preclude coverage.

For these reasons, we agree with the Warren Circuit Court and the Court of Appeals that BCC has the duty under the CGL policy to defend and indemnify Kenway. Thus, we affirm the Court of Appeals.

LAMBERT, C.J.; NOBLE, SCHRODER, SCOTT, JJ.; and SPECIAL Justices T. STEVEN BLAND and KEVIN L. GARVEY, concur.

MCANULTY and MINTON, JJ., not sitting.