**NOT RECOMMENDED FOR PUBLICATION**

File Name: 14a0400n.06

Nos. 12-6618/13-5015

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Jun 02, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KSPED LLC, | ) | |
| | ) | |
| Plaintiff-Appellee/ | ) | |
| Cross-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| | ) | |
| VIRGINIA SURETY COMPANY, | ) | |
| INC., | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant/ | ) | |
| Cross-Appellee. | ) | |
| | ) | |

**Before: MOORE and GRIFFIN, Circuit Judges; KORMAN, District Judge.**[*]

**EDWARD R. KORMAN, District Judge.** On August 15, 2004, Cynthia Bivens, along with five other individuals including John Marsh, attended an event at the Kentucky Speedway, a race car track in Sparta, Kentucky. R. 24-1, Tr. of Keith Henry Dep. at 3-5 (Page ID #145-47); R. 61, District Ct. Op. at 1 (Page ID #1792). While there, Marsh was served alcohol by a food and beverage concessionaire employee. R. 57-5, K&K Loss Report at 19 (Page ID #1598). Later that day, Bivens sustained fatal injuries when, while riding in a vehicle driven by Marsh, he lost control of the vehicle, causing it to overturn. R. 24-1, Tr. of Keith Henry Dep. at 4-5 (Page ID #146-47).

---

[*]The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

Nos. 12-6618/13-5015, *KSPED, LLC v. Virginia Surety Company, Inc.*

On August 12, 2005, the Estate of Cynthia Bivens commenced a wrongful death lawsuit against Kentucky Speedway ("Speedway"), which owned the racetrack, and DJ's Food Service Management Group, Inc. ("DJ's"), the concessionaire that employed the individual who served Marsh at the racetrack. R. 28-2, Bivens Compl. at 1 (Page ID #511). That action was consolidated with a previous lawsuit brought by the Estate on May 12, 2005 against OS Speedway, LLC ("OS"), a concessionaire that had subcontracted to DJ's the right to sell food and beverages at the Speedway. Appellee Br. 2 at 13. As relevant to Speedway, the Estate's complaint alleged:

> 5. At the time and place stated above the persons selling alcohol and or serving alcoholic beverages to John D. Marsh were agents and or servants of the Defendants, and/or the Defendants were operating a joint venture at the time of selling and or serving alcoholic beverages to John D. Marsh a reasonable person under the same or similar circumstances should have known that John D. Marsh was already intoxicated.
>
> 6. The Defendants, acting by and through their agents and/or servants and/or independently of them, had a duty not to serve John D. Marsh alcoholic beverages under such circumstances, and the conduct aforesaid was in breach of that duty.
>
> 7. At the time and place stated above the DEFENDANT KENTUCKY SPEEDWAY LLC had a duty to so control the conduct of those serving alcoholic beverages so as to prevent them [from] creating an unreasonable risk of harm to others, including Cynthia Bivens.
>
> 8. At the time and place stated above the DEFENDANT KENTUCKY SPEEDWAY LLC had undertaken and represented to the public their power and duty to refuse the sale of alcoholic beverages to anyone which duty they should have recognized as necessary for the protection of third persons, including Cynthia Bivens, and its failure to exercise reasonable care in the discharge of that duty increased the risk of harm to Cynthia Bivens.
>
> 9. At the time and place and under the circumstances above the Defendant, DJ'S FOOD SERVICE MANAGEMENT GROUP, INC., acting as concessionaire, had a duty to not serve alcoholic beverages to John D. Marsh which duty extended to KENTUCKY SPEEDWAY LLC.

10. THE DEFENDANT KENTUCKY SPEEDWAY LLC, retained control of alcohol sales at its facility in Gallatin County Kentucky and as such any breach of duty by DJ'S FOOD SERVICE MANAGEMENT GROUP, INC. is imputed to KENTUCKY SPEEDWAY LLC.

11. At the time and place stated above the DEFENDANT KENTUCKY SPEEDWAY LLC was the possessor of the facility known as The Kentucky Speedway which facility was open to the public. As such it had a duty to Cynthia Bivens, its invitee, to protect her against the unreasonably dangerous activities of its concessionaire, DJ'S FOOD SERVICE MANAGEMENT GROUP, INC., as stated above, which it permitted to engage in the activity of selling and or dispensing alcoholic beverages.

12. Selling and or serving alcoholic beverages to John D. Marsh under the circumstances stated above created an unreasonable and unjustifiable risk [of] harm to others including Cynthia Bivens and was in breach of the duties of the Defendants aforesaid.

R. 28-2, Bivens Compl. ¶¶ 5-12 at 2-3 (Page ID #512-13). The complaint further alleged that as a direct and proximate cause of the Defendants' breaches of these duties, Bivens died and the Estate was damaged by the loss of her power to earn money. *Id.* ¶¶ 14-16 at 3 (Page ID #513). The parties in the Bivens litigation ultimately settled. Liability insurers for OS and DJ's paid the Estate about $350,000, and Speedway settled its portion for $10,000. In addition, Speedway incurred approximately $74,000 in defense fees.

In the present case, Speedway claims that the Virginia Surety Company, Inc. ("Virginia Surety") wrongfully refused to defend and indemnify Speedway pursuant to the Commercial General Liability Coverage policy (the "CGL Policy") that Virginia Surety had issued to Speedway. The district court granted Speedway's motion for summary judgment on its claim that Virginia Surety's failure to defend and indemnify constituted a breach of contract. It granted Virginia Surety's motion

for summary judgment on Speedway's claim that the refusal to defend and indemnify was made in bad faith in violation of the Unfair Claims Settlement Practices Act, Ky. Rev. Stat. § 304.12-230. Virginia Surety appeals the breach of contract decision, and Speedway cross-appeals the bad faith decision.

## I.  BACKGROUND

### A.  Speedway Insurance Agreement with Virginia Surety

Speedway applied for the insurance policy at issue on July 22, 2003.  R. 57-3, K&K Ins. Appl. at 30-34 (Page ID #1506-10).  In turn, Virginia Surety issued the CGL Policy, which provided that Virginia Surety "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies.  [Virginia Surety] will have the right and duty to defend the insured against any 'suit' seeking those damages."  R.28-3, CGL Policy at 14 (Page ID #528).  The parties do not dispute that the underlying action was a suit seeking damages because of bodily injury.  Nevertheless, they disagree over the applicability of the liquor liability exclusion in the CGL Policy, which excludes coverage for liability arising out of the sale of alcoholic beverages if the insured is "in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages."  *Id.* at 14-15 (Page ID #528-29).  Virginia Surety argues that this exclusion applies to Speedway.

**B. Relationship between Speedway and Concessionaires**

**1. Concession Agreement**

In an agreement dated June 5, 2000 ("Concession Agreement"), Speedway granted OS "the sole and exclusive right . . . to sell food and alcoholic and non-alcoholic beverages . . . at the Speedway at any and all events held at the Speedway." R. 28-8, Concession Agreement § 1.1 at 1 (Page ID #583). OS would provide "the concession, catering and restaurant services for and on behalf of" Speedway. *Id.* at 1 (Page ID #583).[1] OS was responsible for retaining, training, monitoring, evaluating, disciplining, and dismissing employees, as appropriate, and it was "solely responsible . . . for the employees and their actions." *Id.* § 2.1 at 2 (Page ID #584). Nevertheless, Speedway had "the right to approve management personnel to be used by" OS at the racetrack, *id.* § 4.3 at 6 (Page ID #588), and retained the option to bar OS from employing anyone else, if it had "a reasonable and lawful basis," and to "provide cross-training" at its own expense, *id.* § 2.1 at 2 (Page ID #584). Perhaps more significantly, although only the concessionaire had a liquor license, Speedway had a right to prevent an impaired patron from purchasing more alcohol. R. 28-11, Tr. of Second Mark Simendinger Dep. at 23 (Page ID #646). Indeed, Speedway's right to do so was

---

[1]Speedway and OS each acknowledged and agreed in the Concession Agreement that OS was an "independent contractor" and that Speedway and OS were "not joint venturers, partners, or otherwise related to each other in any capacity." R. 28-8, Concession Agreement § 15.1 at 13 (Page ID #595). Nor was OS to be "deemed an agent" of Speedway. *Id.* § 15.2 at 14 (Page ID #596). They "specifically agreed" that OS was "not an employee" of Speedway, and that the employees performing concession services under the agreement were "solely employees of [OS] and not employees of [Speedway]." *Id.* § 15.1 at 13 (Page ID #595). These characterizations, and other language intended define the relationship between Speedway and the concessionaire, *id.*, may be relevant to the resolution of any dispute between them. They do not, however, address the issue of whether Speedway was in the "business of selling alcohol," as that term is used in the CGL Policy.

contained in a document that it distributed to its patrons containing the racetrack's rules. *Id.* at 22-23 (Page ID #645-46). In addition to advising patrons that they had to be at least 21 years old and present photo identification with proof of age when purchasing alcohol, the document provided that "[w]e reserve the right to refuse alcoholic beverages to any person for any reason and will contact police if we believe you are acting in a manner that is contrary to the law or that may endanger yourself, others, or any property." *Id.* at 23 (Page ID #646).

Speedway also retained the right to select the food and beverages, except for alcohol, that would be served. R. 28-8, Concession Agreement § 2.3 at 3 (Page ID #585). Nevertheless, "whether alcoholic beverages w[ould] be sold at particular events" was Speedway's decision, *id.* § 2.6 at 3 (Page ID #585), and alcohol was sold at all racing events, as well as other events, at the racetrack, R. 28-11, Tr. of Second Mark Simendinger Dep. at 5, 15 (Page ID #628, 638). While OS was responsible for establishing food and drink prices, including alcohol, Speedway retained the right to reasonably withhold approval of those prices. R. 28-8, Concession Agreement § 2.4 at 3 (Page ID #585). Moreover, OS and Speedway were required to cooperatively develop and institute promotional programs for food and drink items. *Id.* § 2.5 at 3 (Page ID #585).

Both Speedway and OS were responsible for obtaining necessary permits and licenses. *Id.* § 12.1 at 11-12 (Page ID #593-94). Indeed, the Concession Agreement required OS to obtain, among other forms of insurance, liquor liability, including dram shop liability insurance. *Id.* § 13.1 at 12 (Page ID #594). Speedway was required to be named as an "additional insured" on all such insurance. *Id.* Moreover, OS agreed to "indemnify, defend and hold [Speedway] harmless from and against any liability incurred by [Speedway] as a result of the willful act, negligence or omission of

6

[OS], its employees, agents, and contractors, and any other persons within its control." *Id.* § 10.1 at 9 (Page ID #591).

The Concession Agreement also required OS to provide concession services during the hours that OS and Speedway jointly established, "with the goal of maximizing concession revenue." *Id.* § 2.6 at 3 (Page ID #585). Thus, regarding the sale of alcohol, Speedway's president acknowledged that Speedway "would, like any other businessman, . . . certainly like to maximize revenue within that context." R. 28-11, Tr. of Second Mark Simendinger Dep. at 16 (Page ID #639). Moreover, patrons were not permitted to bring alcohol from outside into the Speedway. *Id.* at 23 (Page ID #646).

Finally, the Concession Agreement provided that OS had to pay Speedway between 30% and 35% of its gross receipts from alcohol. R. 28-8, Concession Agreement § 8.1 at 7-8 (Page ID #589-90). Because the 30% to 35% came from the gross receipts, presumably before all other expenses incurred by the concessionaire were taken into account, the percentage of the net revenue was significantly higher. Speedway's president acknowledged that Speedway benefitted from increased alcohol sales because it "gets a higher commission check." R. 28-11, Tr. of Second Mark Simendinger Dep. at 6 (Page ID #629). The total amount paid to Speedway in commissions from the sale of alcohol in 2004 was $282,837. R. 22, Liquor Sales Stipulation ¶ 2 at 1 (Page ID #136).

### 2. Subconcessionaire Agreement

As allowed by the Concession Agreement, R. 28-8, Concession Agreement § 1.3 at 1 (Page ID #583), OS subcontracted the exclusive right to sell food and beverage products, including alcoholic beverages, to DJ's in a contract dated June 16, 2000 ("Subconcessionaire Agreement"),

7

R. 28-9, Subconcessionaire Agreement at 1-24 (Page ID #598-621). The Subconcessionaire Agreement repeats or adopts by reference the relevant portions of the Concession Agreement. *Id.*

## II. DISCUSSION

### A. Breach of Contract Claim

#### 1. The Duty to Defend

The breach of contract dispute is based solely on the applicability of the clause in the CGL Policy that excludes coverage for liability arising out of the sale of alcoholic beverages "only if you [the insured] are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages." R. 28-3, CGL Policy at 15 (Page ID #529). The CGL Policy defines "you" as "the Named Insured shown in Declarations and any other person or organization qualifying as a Named Insured under this policy." *Id.* at 14 (Page ID #528). Speedway is the only "Named Insured" included in the CGL Policy's declarations. *Id.* at 11 (Page ID #525). The CGL Policy does not define "in the business of."

Interpretation of an insurance contract is a matter of law. *Westfield Ins. Co v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003). "[A]n insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy." *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005). This duty is separate from and broader than the duty to indemnify. *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991); *see also Nat. Union Fire Ins. Co. v. United Catalysts, Inc.*, 182 F. Supp. 2d 608, 610 (W.D. Ky. 2002). "The determination of whether a defense is required must be made at the outset of the litigation by reference to the complaint and known facts." *Lenning v.*

8

*Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (citations and quotation marks omitted); *see also Pizza Magia Int'l, LLC v. Assurance Co. of Am.*, 447 F. Supp. 2d 766, 779 (W.D. Ky. 2006). Moreover, "Kentucky has consistently recognized that an ambiguous policy is to be construed against the drafter, and so as to effectuate the policy of indemnity." *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2007); *Brown Found.*, 814 S.W.2d at 279; *Auto-Owners Ins. Co. v. Veterans of Foreign Wars Post 5906*, 276 S.W.3d 298, 301 (Ky. Ct. App. 2009).

Virginia Surety argues that because the decision whether to defend must be made at the outset of the litigation, the allegations in the underlying complaint determine whether there is a duty to defend. That complaint alleges that the individuals who sold alcohol at the racetrack were acting as agents of or were operating a joint venture with Speedway, and that Speedway had a duty to control those individuals, R. 28-2, Bivens Compl. ¶¶ 5-7 at 2 (Page ID #512). If true, these allegations are sufficient to establish that Speedway was in the business of selling alcohol, and that Virginia Surety was not obligated under a duty to defend the action against Speedway.

Nevertheless, the allegations in the complaint do not contain the only relevant facts. Under Kentucky law, the decision whether to defend "must be made at the outset of litigation by reference to the complaint and *known facts*." *Lenning*, 260 F.3d at 581 (quotation omitted) (applying Kentucky law) (emphasis added); *see also Pizza Magia*, 447 F. Supp. 2d at 779. Indeed, permitting an insurer to ignore facts, known to it at the time it decided whether to defend, that establish the potential for coverage could render the duty to defend narrower than the duty to indemnify. 3, Jeffrey E. Thomas & Francis J. Mootz, III, *New Appleman on Insurance Law Library Edition:*

*Commercial General Liability Insurance* § 17.01[2][b][i] (2013) (citing *Fitzpatrick v. Am. Honda Motor Co. Inc.*, 575 N.E.2d 90, 92-93 (N.Y. 1991) (citing cases)). Moreover, ignoring known facts inappropriately conditions the duty to defend on the "draftsmanship skills or whims of the plaintiff in the underlying action." *Appleman*, § 17.01[2][b][i] (citing *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 827 (7th Cir. 1992)). Virginia Surety's argument is particularly problematic where, as here, the insurer denied coverage based on a policy exclusion because "exclusions in insurance policies should be narrowly construed as to effectuate insurance coverage." *Aetna Cas.*, 179 S.W.3d at 839.

Looking to the facts known to Virginia Surety at the time it declined to defend Speedway does not undermine the validity of Virginia Surety's judgment that Speedway was "in the business of" selling alcohol. These facts come principally from the concession agreements, which Virginia Surety possessed. R. 58-7, Email from Lawrence Bistany to David Rodriguez & Dan Isenbarger (Sept. 20, 2005) at 1 (Page ID #1754). Specifically, the sale of alcohol "occurred every day the track operated," *id.*, and Speedway maintained significant control over its sale. Indeed, Speedway was involved with instituting promotional programs for concessions, R. 28-8, Concession Agreement § 2.5 at 3 (Page ID #585), decided whether alcoholic beverages would be sold at particular events, *id.* § 2.6 at 3 (Page ID #585), and was entitled to advance notice of the pricing policies and to withhold its approval provided it was not unreasonable to do so, *id.* § 2.4 at 3 (Page ID #585). Moreover, Speedway and the concessionaires jointly established the hours during which concession services were offered, "with the goal of maximizing concession revenue." *Id.* § 2.6 at 3 (Page ID #585). Speedway also "receive[d] between 30 and 35% of the gross receipts from liquor

10

sales."  R. 58-7, Email from Lawrence Bistany to David Rodriguez & Dan Isenbarger (Sept. 20, 2005) at 1 (Page ID #1754).

The Concession Agreement and Subconcessionaire Agreement also required that the insurance policies of the concessionaires include liquor liability insurance, and that Speedway be named as an additional insured, R. 28-8, Concession Agreement § 13.1 at 12 (Page ID #594). Speedway's status as an additional insured provided it with the same protection as the concessionaires against liability for the sale of alcohol.  While the concessionaires possessed the license to sell liquor, and the sale was effectuated by one of their employees, R. 57-5, K&K Loss Report at 19 (Page ID #1598), these facts do not undermine the conclusion that Speedway and its concessionaires were engaged in a joint enterprise of selling alcohol, over which Speedway exercised substantial control, and in which they shared in the net profits almost equally and assisted each other in undertaking efforts to maximize the sale of alcohol and the profits that resulted from it.  In sum, the facts known to Virginia Surety at the time it made its decision not to defend Speedway confirm that Speedway was "in the business of" selling alcohol.

### 2. Duty to Indemnify

We now turn to the duty to indemnify.  This is analytically separate from the issue of the duty to defend because a separate standard governs each.  "[A]n insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy." *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005).  On the other hand, an insurer has a duty to indemnify only if liability for which indemnification is sought is actually covered by the insurance contract.  Unlike the issue of the duty to defend, we can consider

all facts in the record that go to the issue of coverage even if the insurer was not aware of them prior to making the decision whether to defend.

One Kentucky court that has addressed the term "in the business of" in a liquor liability exclusion, has focused on the regularity with which the activity at issue—here, alcohol sales—occupies the insured, and whether the insured operated with a profit motive. *See Auto-Owners Ins. Co. v. Veterans of Foreign Wars Post 5906*, 276 S.W.3d 298 (Ky. Ct. App. 2009) (citing *Am. Legion Post #49 v. Jefferson Ins. Co.*, 485 A.2d 293, 294 (N.H. 1984) ("'[e]ngaged in the business of'" means "any regular activity that occupies one's time and attention, with or without direct profit motive" or "an activity with a direct profit objective")); *see also Fraternal Order of Eagles*, *v. Gen. Accident Ins. Co. of Am.*, 792 P.2d 178, 182-83 (Wash. Ct. App. 1990) ("in the business" limits "the exclusion's applicability to permanent, ongoing liquor sales operations, rather than occasional events at which the insured may sell liquor"). This test is clearly met here, if only because Speedway's involvement in the sale of alcohol was an activity undertaken with a direct profit objective, Speedway's activities related to encouraging the ongoing sale of alcohol, and it exercised a significant degree of control over the concessionaires.

Moreover, there are two additional facts that became known to Virginia Surety after it declined to defend Speedway that add to the evidence that Speedway was "in the business of" selling alcohol. First, in an obvious effort to increase the sale of alcoholic beverages, from which Speedway derived substantial profit, Speedway prohibited persons entering the racetrack from bringing in any alcoholic beverages. R. 28-11, Tr. of Second Mark Simendinger Dep. at 5 (Page ID #628). Second, Speedway distributed a document to its patrons that contained the racetrack's rules. *Id.* at 22-23

12

(Page ID #645-46). Because the rules were published in alphabetical order, the alcohol policy was contained on the first page. *Id.* It advised patrons that they had to be at least 21 years old and present photo identification with proof of age when purchasing alcohol. *Id.* More significantly, it provided that "[w]e reserve the right to refuse alcoholic beverages to any person for any reasons and will contact police if we believe you are acting in a manner that is contrary to the law or that may endanger yourself, others, or any property." *Id.* at 23 (Page ID #646). Consistent with these written rules, Speedway had the right to prevent an impaired patron from purchasing more alcohol. *Id.* As the president of Speedway testified in the following colloquy during his deposition:

> Q. . . . So even though the server was not your employee, you all, as the Owner, if you believed there was someone so impaired, visibly, that they shouldn't be served, you would agree you would have had the right to say to the server, don't serve this person?
>
> A. Yes, we would have had that right. And I think we also would have had the right to have just not even deal directly with the server, but just deal directly with the patron.

*Id.*

The exercise of this control over the serving of alcohol is particularly significant because it relates directly to the circumstances under which Speedway would be liable to third persons who are injured by the sale of alcoholic beverages to underage persons or persons whom a reasonable person would know are already intoxicated at the time of serving. Ky. Rev. Stat. § 413.241(2); *see also Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328, 333 (Ky. 1987). Indeed, the breach of the latter duty provides the principal basis for the underlying complaint against Speedway. Speedway's substantial control over the manner in which alcohol was sold, beyond simply for the purpose of maximizing profits, only confirms our judgment that,

notwithstanding the fact that the persons serving alcoholic beverages were not Speedway employees and that Speedway did not have a liquor license, Speedway was in the business of selling alcohol. The fact that Speedway chose to engage in the business of selling alcohol by entering into an agreement with a concessionaire who possessed such a license does not relieve it of the consequences of the conduct in which it engaged. Speedway exercised substantial and meaningful control over the sale of alcohol.

While we have focused on the nature of the legal relationship between Speedway and the concessionaires, it is important not to lose sight of the purpose of the liquor liability exclusion. The CGL Policy, as its language suggests, provides coverage, without payment of additional premiums, where the sale or serving of alcohol occurs on an infrequent basis because of the significantly lower risk of such limited activity. The exclusion of liquor liability coverage reflects the commonsense consideration that the use of premises for an ongoing venture of selling alcoholic beverages significantly increases the risk to the insurer. *See Cnty. of Schenectady v. Travelers Ins. Co.*, 368 N.Y.S.2d 894, 897-98 (N.Y. App. Div. 1975). Whether the insured directly furnishes alcohol to consumers and whether it is licensed to do so do not affect the increased risk of insuring a party engaged in the regular for-profit sale of alcohol that the liquor liability exclusion removes from coverage. As the Supreme Court of Wisconsin observed, "to determine the meaning of 'business,' the relevant inquiry under the policy is the nature of the insured's activities, not the nature or mode of its organizational status. The court must determine whether the insured consistently engages in an activity which creates a level of risk which the insurer has declared unacceptable." *Sprangers*

14

*v. Greatway Ins. Co.*, 514 N.W.2d 1, 8 (Wis. 1994). The record here establishes that Speedway consistently engaged in activity that created a level of risk declared unacceptable in the CGL Policy.

Nor do the facts that selling alcohol was not the primary activity in which Speedway was engaged, and that such sales might not have accounted for a large fraction of its total revenue, alter the significantly increased risk created by the ongoing sale of alcohol. An insured may be "in the business of" of selling alcohol even when only a small portion of its revenue comes from alcohol. *See United States Fid. & Guar. Co. v. Country Club of Johnston Cnty., Inc.*, 458 S.E.2d 734, 739 (N.C. Ct. App. 1995). Nor is it required that alcohol sales constitute a substantial portion of the insured's activities. *See id.*; *Woodall v. Alfa Mut. Ins. Co.*, 658 So.2d 369, 371 (Ala. 1995); *Fraternal Order*, 792 P.2d at 183.

While we decide this case in favor of Virginia Surety, our decision should not be viewed as an endorsement of the manner in which it drafted its liquor liability exclusion. There are at least two reported cases that provide examples of liquor liability exclusion clauses that could have easily avoided the burden and expense of this litigation. First, in *Cnty. of Schenectady v. Travelers Ins. Co.*, the insurance policy provided that it did not apply to bodily injury or property damage for which any insured "may be held liable, as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages *or as an owner or lessor of premises used for such purposes*, by reason of the selling, serving or giving of any alcoholic beverage." 368 N.Y.S.2d 894, 897-98 (N.Y. App. Div. 1975) (emphasis added). Similarly in *McGriff v. United States Fire Ins. Co.*, the liquor liability exclusion provided that the insurance policy did not cover the "an owner or lessor of premises used for" the manufacturing, distributing,

15

selling or serving alcoholic beverages. 436 N.W.2d 859, 861 n.1 (S.D. 1989). Virginia Surety's failure to draft a broader exclusion, however, does not render the insurance company liable in this case. Speedway did not simply rent space to a vendor and collect a flat fee for the right to use the space. Our conclusion that Speedway was in the business of selling alcohol is based on its ongoing and coordinated activity with the concessionaires in an effort to profit from the continuing and ongoing sale of alcohol—activity which significantly increased the risk beyond that contemplated in the CGL Policy.

## B. Bad Faith Claim

To prevail on a bad faith claim under Section 304.12-230 of the Unfair Claims Settlement Practices Act, the insured must prove that: (1) the insurer is obligated to pay the claim under the terms of the policy; (2) the insurer lacks a reasonable basis in law or fact for denying the claim; and (3) the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. *United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (quoting *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)). Because we hold that Virginia Surety was not obligated to pay Speedway's claim under the CGL Policy, we affirm the district court's grant of summary judgment to Virginia Surety.

## III. CONCLUSION

We hold that Speedway was "in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages," and that Virginia Surety did not deny Speedway's claim in bad faith. We vacate and remand the district court's grant of summary judgment to Speedway on the

breach of contract claim, and affirm the district court's grant of summary judgment to Virginia

Surety on the bad faith claim.  **REVERSED in part, AFFIRMED in part.**

**KAREN NELSON MOORE, concurring in part and dissenting in part.**  The majority holds that Speedway was entitled to neither indemnification nor a defense from Virginia Surety because it was "in the business of" selling alcohol.  Because I conclude that Speedway was not "in the business of" selling alcohol, the CGL Policy's liquor liability exclusion is not applicable in this case.  Accordingly, Virginia Surety had a duty to defend and to indemnify Speedway in the wrongful death lawsuit filed by Cynthia Bivens's estate.  I respectfully dissent from the portion of the majority opinion that relieves Virginia Surety of its duties to defend and indemnify.

Because the CGL Policy does not define what it means to be "in the business of" selling alcohol, the court's first task is to determine as a matter of law how to define the term.  *See Auto-Owners Ins. Co. v. Veterans of Foreign Wars Post 5906*, 276 S.W.3d 298, 301 (Ky. Ct. App. 2009). Kentucky courts have embraced two alternative meanings of the term "in the business of":  (1) "any regular activity that occupies one's time and attention, with or without direct profit motive" *or* (2) "an activity with a direct profit motive." *Id.* (citing *Am. Legion Post No. 49 v. Jefferson Ins. Co.*, 485 A.2d 293 (N.H. 1984)).  Courts apply "the general principle that if a contract of insurance is fairly susceptible to two constructions, one of which is more favorable to the insured than the other, the construction most favorable to the insured should be adopted." *McGriff v. U.S. Fire Ins. Co.*, 436 N.W.2d 859, 862 (S.D. 1989); *see also Am. Legion*, 485 A.2d at 294–95 (applying the second alternative definition because it was more favorable to the insured).  Under the first alternative definition, an insured is not "in the business of" selling alcohol, even if the insured has a profit motive in alcohol sales as Speedway did in this case, so long as the sale of alcohol is not a fairly

significant aspect of the business. Thus, the first alternative is more favorable to Speedway and should be utilized in this case.

Speedway did not itself engage in alcohol sales, but instead made the strategic business decision to contract responsibility for alcohol sales, and the attendant liability, to concessionaires. R. 27-5 (Concession Agreement) (Page ID #402–16). The fact that Speedway allowed liquor sales on its property on a regular basis is not dispositive because Speedway did not itself run alcohol sales operations. Although Speedway had final approval authority over some aspects of alcohol sales, such as decisions relating to pricing and which events would include alcohol sales, *id.* at 2–3 (Page ID #403–04), alcohol sales did not occupy significant time or attention of Speedway executives or employees. Indeed, Speedway contracted alcohol sales to a vendor specifically so that the amenity would be available for customers without drawing attention away from other vital aspects of operating the speedway, such as obtaining sponsorships and regulating ticket sales. R. 28-11 (Simendinger Dep. at 46–47, 61) (Page ID #635, 639).

The majority concludes that "Speedway and its concessionaires were engaged in a joint enterprise of selling alcohol" because they worked together "to maximize the sale of alcohol and the profits that resulted from it." Maj. Op. at 11. If Speedway were engaged in a true joint venture with its concessionaires, then Speedway would be considered a partner in the business of the concessionaires, which included alcohol sales. *See Huff v. Rosenberg*, 496 S.W.2d 352, 355 (Ky. 1973). However, because there was no agreement between Speedway and the concessionaires to share profits and losses, there was no "community of pecuniary interest." *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001) (citation omitted). Thus, there was no joint venture in place under

which Speedway could be considered as "in the business of" selling alcohol. To the extent that the majority analyzes whether Speedway was in an agency relationship with its concessionaires, its efforts are misplaced: an agency relationship is not relevant to determining the contours of Speedway's business because the master in an agency relationship is not a partner in the agent's business. The sale of alcohol was not a "regular activity" to which Speedway, as opposed to its concessionaires, devoted significant time and attention, and thus I conclude that Speedway was not "in the business of" selling alcohol. Therefore, the liquor liability exclusion contained in the CGL Policy does not apply, and Virginia Surety has an obligation to indemnify Speedway for the expenses incurred in settling the lawsuit brought by Cynthia Bivens's estate.

I also conclude that Virginia Surety had a duty to defend Speedway against Bivens's lawsuit. As the majority explains, "an insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy." *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005). This duty is broader than the duty to indemnify, *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991), and clearly includes all suits in which the insurer must indemnify the insured.

Although I respectfully dissent from the majority with respect to Virginia Surety's appeal regarding its duties to defend and indemnify Speedway, I agree that Virginia Surety did not act in bad faith such that it is subject to liability under the Unfair Claims Settlement Practices Act. Ky. Rev. Stat. § 304.12-230. As the divided opinions within this panel confirm, Virginia Surety had a "reasonable basis in law . . . for denying the claim," *United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (citation omitted), and it therefore did not deny coverage in bad faith.

20

For the foregoing reasons, I would **AFFIRM** the judgment of the district court in its entirety.